McGEENEY v. MORAN TOWING CORPORATION et al.

THE LAWRENCE McGEENEY.

No. 316.

Circuit Court of Appeals, Second Circuit.

June 1, 1945.

Horace T. Atkins, of New York City, for Maritime Terminal Co., Inc., respondent-impleaded-appellant.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant-appellee.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan, of New York City, of counsel), for Moran Towing Corporation, respondent-appellee.

Before L. HAND, AUGUSTUS N. HAND and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

On February 9, 1943, the libellant chartered her scow Lawrence McGeeney to Moran Towing Corporation for an indefinite period. The scow was thereupon delivered to Moran Towing Company and the latter used it in its business. The charter was the ordinary harbor charter entered into by telephone and constituted a demise to Moran of the scow. The latter had a contract with Maritime, which was a stevedoring concern, to furnish Maritime with scows to receive and effect the disposal of ballast from steamers coming into New York Harbor. The Steamship Skiensfjord arrived carrying 1750 tons of wet sand ballast. Moran furnished the scows Seaboard 49 and O'Hara to Maritime to receive the discharge of this ballast. It was found in the course of the unloading that another scow was needed in order to receive the sand ballast on the Skiensfjord that was beyond the capacity of the Seaboard 49 and the O'Hara. Morace, an officer of Maritime, called on Moran for the additional scow and on September 5, 1943, Moran sent the Lawrence McGeeney, which it had under charter, to receive and dispose of the wet sand ballast remaining on the steamer. This scow had already received some 400 tons of try sand ballast from another ship and when she arrived alongside the Skiensfjord had to take on about 150 tons more in order to complete the discharge. When she reached the steamer she had 400 tons of sand ballast on board, was in all respects seaworthy and had a capacity that was ample to receive the additional 150 tons to be loaded on her. Maritime proceeded to discharge the wet sand ballast from the Skiensfjord, did not trim it with shovels, but discharged it on the piles of dry soft sand already on the scow by dumping in from a bucket operated from a boom on the steamer's tackle. By about 5 P. M. Maritime had discharged all but about 30 tons of the sand ballast remaining on the Skiensfjord. At that time the scow had a list to port of 8 or 9 inches. The bargee Palmer noticed the list and told the stevedore who was dumping the bucket to put sand on the starboard side, who replied: "we have got plenty left down below; I will fix that up later." Moran's employee Berg, who was the outside superintendent of Moran, also said to Maritime's officer Morace: "We are getting too much list on the scow; try the buckets and try to dump it to starboard." We do not find proof in the record that these suggestions were followed. The bargee testified that the stevedore operating the dumping bucket "didn't pay any attention to his suggestions but said: "There is plenty of sand. We will fix that up later." After the conversation with the stevedore the bargee went to his cabin, the stevedores completed unloading the 30 tons of sand ballast and left for the day. When the bargee came out of his cabin the stevedores had already gone but the scow was then listed to port, that is, toward the ship. He said that he thought they had gone ashore to eat and were coming back to trim the scow "but they never showed up." He testified that "she began to go over a little at a time * * * the sand was sliding," and when she "hit the side of the ship turned over."

The District Court found the following facts:

"12. By about 5 o'clock P. M. on September 5th, 1943, the Respondent-Impleaded had discharged all but 30 tons to be discharged, at which time the said deck scow had a list of about 8 or 9 inches to port, which was not considered dangerous."

"15. Subsequently she started to list toward the said steamship, and listing increased until between 9 and 9:30 o'clock on that evening the said deck scow turned over toward the said ship, and received damage."

"20. She was improperly loaded, the coarse wet sand placed on the side of the piles of soft dry sand already on board caused the piles to split and the cargo to shift."

"21. Trimming with shovels is not customary on loading ballast sand, but, the

conditions must control, and this was a case where the cargo should have been trimmed by shovel."

"22. The piles of sand were higher than the bulkheads of the McGeeney, and that increased the danger of sliding or running of the cargo."

"23. The deck scow was listed at about 5 o'clock P. M. and that was overcome thereafter by loading the remaining 30 tons on the opposite side to overcome the list."

"24. From the time the said deck scow started to list, after the loading was completed, she would list a little, stop, and then increase her list from time to time, until she finally turned over."

There is no foundation in the record for Finding 23, unless it may possibly be inferred from the testimony of the stevedore Panettieri, who said that he saw no list when the loading was completed at 7 P. M., that the list existing at 5 P. M. had been corrected by loading the 30 tons on the starboard side. But his testimony disclosed no list at any time and his statement, contrary to the findings, that the sand loaded by him (fols. 357, 358) and that already on the scow when she was brought alongside the ship were of the same character deprived his testimony of reliability. This fact coupled with the failure to produce any direct evidence that the suggestions to load the 30 tons on the starboard side were followed rendered them of no bearing upon the accident.

■ The court granted a decree awarding damages to the libellant against Maritime primarily and against Moran secondarily. The decision was based on the conclusion that the scow was negligently loaded by Maritime because wet sand was placed on dry sand and that because of the agreement in the harbor charter that she was to be returned by Moran in the condition received, except for ordinary wear and tear, the latter became liable for the negligence of Maritime.

In view of the foregoing there can be no doubt that Maritime was liable for the damage that overtook the scow. Maritime was not only a stevedoring company employed by Moran to do its stevedoring, but was a company having special experience in discharging sand ballast. If, as has been argued, the piles of sand on the scow when she came alongside the ship were too high and likely to slide under the pressure of an additional load of heavy wet sand, Maritime should either have declined to begin loading a vessel in that condition or should have trimmed the scow by using shovels to even the load or by depositing the new sand from the buckets in such a way as to keep the vessel on an even keel, if trimming could be effected by that means. In any event, it was not the duty of the charterer as between it and Maritime to trim the scow.

■ But it is said that Moran's superintendent Berg assumed responsibility for the loading of the scow or at least indicated to Maritime that it was safe to carry the wet sand on the piles of dry sand if, as he suggested, the last 30 tons were deposited on the starboard side of the vessel —in other words, that Berg acceded to Maritime's method of loading heavy wet sand on the dry piles which is said to have caused the shifting from which the vessel capsized, provided none of the last 30 tons was placed on the port side. We think that it was natural for the superintendent and the bargee to suggest to the stevedoring company to load the 30 tons on the starboard side of the scow when they saw she showed a list to port, but we cannot regard this suggestion, which indeed was not followed, as an interference with the stevedores or an assumption of control of the loading. That they were only making a suggestion, and not giving orders, is evident from the fact that Berg left the premises for the day immediately after he made the suggestion and did not wait to see that it was followed, and that Palmer, the bargee, not only had no duty in respect to loading or trimming, which was left to their experienced independent contractor, but when he called the attention of the stevedore, who was dumping the bucket, to the list of the scow to port was told that the stevedore would fix up the list later. It ought not to be inferred from the suggestions, that Moran approved of loading heavy wet sand on high piles of dry sand, or that it undertook to control the stevedoring company in its mode of loading. Moran doubtless employed experienced stevedores to judge as to such matters. Accordingly, we find no reason for a division of damages as between Maritime and Moran. Maritime was responsible for loading and was found by the District Court to have performed its work negligently. It, therefore, was rightly held primarily liable to libellant for the damage to the scow and Moran only secondarily liable.

Decree affirmed.