## SEABOARD SAND & GRAVEL CORPORATION v. MORAN TOWING CORPORATION et al.

### THE SEABOARD NO. 21.

### No. 193.

Circuit Court of Appeals, Second Circuit.

April 3, 1946.

---

Thomas H. Middleton, of New York City (Hill, Rivkins & Middleton, of New York City, on the brief), for appellant.

Christopher E. Heckman, of New York City (Foley & Martin, of New York City, on the brief), for libellant-appellee.

Leo F. Hanan, of New York City (Macklin, Brown, Lenahan & Speer, of New York City, on the brief), for respondent-appellee.

Before L. HAND, SWAN, and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge.

Seaboard Sand & Gravel Corporation,[1] as owner of scow "Seaboard No. 21,"[2] instituted this action against Moran Towing Corporation[3] to recover damages sustained by No. 21. Moran impleaded Terminal Stevedoring Company, Inc.,[4] alleging that it loaded No. 21 "in such an improper and uneven manner that the scow was caused to leak, capsize and dump her cargo." In its libel, Seaboard charged that at the time Moran returned No. 21 to Sea-

---

[1] Hereinafter called Seaboard.
[2] Hereinafter called No. 21.
[3] Hereinafter called Moran.
[4] Hereinafter called Terminal.

board, it was not in the same condition as when received but was in a damaged condition.

On March 6, 1944, Moran chartered No. 21 from Christie Scow Corporation [5] which theretofore had chartered it from Seaboard.

No. 21 was thoroughly searched and calked in June, 1942. In March, 1943, she was sent to a shipyard where repairs necessary to put her in good condition were made. Seventeen days before Moran chartered her, two of Seaboard's employees examined her and found her in good condition, seaworthy, and not leaking. She had been used to carry sand and gravel, ballast, airplanes, and other cargo.

On March 6, 1944, No. 21 was sent to receive ballast from the steamer "Lieutenant Delatour" at the south side of Pier 16, East River. She was loaded by Terminal's employees. Loading from the "Delatour" was stopped at 11 a. m., March 8, 1944, when there were approximately 600 tons of damp, fine, beach sand ballast aboard. On the afternoon of that day, Moran's dispatcher learned that another scow was needed to take slag ballast from the steamship "Schoharie." Moran's runner, looking for another scow, visited No. 21 still lying alongside "Delatour" at about 5 p. m. He estimated that No. 21 was then loaded to approximately 600 tons. Her carrying capacity was 750 tons. He observed that No. 21 had an 18-inch portside list. Terminal's employees had loaded the sand unevenly and permitted it to fall in cone-shaped piles about nine feet high which were untrimmed and to the portside of center, thereby causing the list. No. 21 then had eight inches of freeboard on the portside and a little over two feet on the starboard side. Although she had been loaded several hours and was listing, she had taken no water, indicating that the upper seams were tight. Moran's runner reported to its dispatcher that No. 21 could take 75 to 100 tons of "Schoharie's" ballast. Moran caused No. 21 to be moved to the "Schoharie" about 8 p. m., on March 8, 1944. She was moored without mishap but was still listing to port on her arrival at "Schoharie." "Schoharie's" ballast was slag, ranging from powder to lumps six to eight inches square. Terminal's employees

began loading the slag ballast from "Schoharie" onto No. 21 without trimming the cargo. It was the duty of Terminal's employees to trim the cargo.[6] Terminal's employees dumped the slag onto the sand piles. After transferring approximately 150 tons from "Schoharie" to No. 21, which consumed about five hours, work was suspended at about 3 a. m., March 9, 1944, to repair the winch. About 4:30 on that morning, No. 21 turned turtle, dumped her cargo into the slip, and sustained hull damages.

The trial court found that the overturning of No. 21 was caused by the loading of slag ballast on the untrimmed piles of sand in excessive quantities, without trimming either the sand ballast or the slag ballast to avoid the danger of the load sliding; that Terminal was negligent in loading an excessive quantity of slag ballast on No. 21 when she was listing and without trimming the sand ballast already on board; that Seaboard and the man in charge of No. 21 were without fault; that the careening of No. 21 was not caused or contributed to by Moran; and that Terminal and its servants had been employed by "Schoharie" to perform the stevedore services, and were not servants, agents, or employees of Moran.

Terminal has appealed from an interlocutory decree awarding Seaboard full recovery against it, and Seaboard has appealed from that portion of the decree dismissing the libel as to Moran. Terminal was responsible for the manner in which No. 21 was loaded.[7]

Terminal contends that the court erred in admitting evidence as to fault in putting the slag on top of the sand. Terminal pleaded both improper and uneven loading. Terminal did not claim surprise nor ask for a continuance. In that posture of the case, we think the contention is without merit.

The findings of the trial court are supported by evidence and are not clearly erroneous.

The evidence established seaworthiness. Moreover, if a presumption of unseaworthiness arose from the occurrence of the accident, it was overcome by evidence establishing that the careening was caused by improper and uneven loading.[8]

---

[5] Hereinafter called Christie.

[6] McGeeney v. Moran Towing Corporation, 2 Cir., 149 F.2d 791, 793.

[7] Hastorf Contracting Co. v. Ocean Transportation Corporation, D.C.N.Y., 4 F.2d 583, affirmed 2 Cir., 4 F.2d 584.

[8] See The Adah, 2 Cir., 258 F. 377, 379, 380.

While Moran may have been negligent in moving No. 21 before the cargo was trimmed, the movement was without mishap. It did not cause or contribute to the careening which occurred several hours thereafter. We think Moran, itself, was without fault.[9]

The question remains, Was Moran liable for the negligence of Terminal? The trial court held it was not, because there was no contract·relation between Seaboard and Moran.

While many of the adjudicated cases refer to a bailment as a contractual relation, the statement is not entirely accurate. The relation may be created by operation of law.[10] It is the element of lawful possession, and the duty to account for the thing as the property of another, that creates the bailment, whether such possession results from contract or is otherwise lawfully obtained.[11] It makes no difference whether the thing be intrusted to a person by the owner or by another. Taking lawful possession without present intent to appropriate creates a bailment.[12] We conclude, therefore, that the relation of bailor and bailee existed between Seaboard and Moran.

It is the duty of a charterer, as bailee, to care for a vessel while it is under charter to him and he cannot delegate that duty to others. While he does not warrant the safety of the vessel intrusted to him, he does have an obligation to have her properly cared for by any person to whom he intrusts the vessel and is liable for the acts of negligence of the person to whom he intrusts her.[13] The principle applies to subcharterers;[14] and we can conceive of no reason why it should not be applied as between the owner and a subcharterer, as bailee. It follows that Moran was secondarily liable for the negligence of Terminal.

The decree against Terminal is affirmed. That part of the decree dismissing the libel against Moran is reversed, and the cause is remanded, with instructions to enter a decree adjudging Moran secondarily liable.

---

[9] Cf. Hastorf Contracting Co. v. Ocean Transportation Corporation, D.C.N.Y., 4 F.2d 583, affirmed 2 Cir., 4 F.2d 584.

[10] Burns v. State, 145 Wis. 373, 128 N.W. 987, 990, 140 Am.St.Rep. 1081; Foulke v. New York Consol. R. Co., 228 N.Y. 269, 127 N.E. 237, 239, 9 A.L.R. 1384; Smith v. Nashua & L. Railroad, 27 N.H. 86, 90, 91, 59 Am.Dec. 364.

[11] Foulke v. New York Consol. R. Co., 228 N.Y. 269, 127 N.E. 237, 239, 9 A.L.R. 1384; Armstrong v. Sisti, 242 N.Y. 440, 152 N.E. 254, 256; Burns v. State, 145 Wis. 373, 128 N.W. 987, 990, 140 Am.St.Rep. 1081; Matta v. hat-soulos, 192 Wis. 212, 212 N.W. 261, 50 A.L.R. 291; Spencer v. First Carolinas Joint Stock-Land Bank of Columbia, 167 S.C. 36, 165 S.E. 731, 732; Wilson v. Citizens Central Bank of Nelsonville, 56 Ohio App. 478, 11 N.E.2d 118, 119; Note, 43 A.L.R. p. 150.

[12] Burns v. State, 145 Wis. 373, 128 N.W. 987, 990, 140 Am.St.Rep. 1081.

[13] See O'Donnell Transp. Co., Inc. v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735, 737, and cases there cited.

[14] O'Donnell Transp. Co., Inc. v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735, 737.