**C. F, HARMS CO. v. ERIE R, CO. et al.**

**THE MARS.**

**No. 17411.**

District Court, E. D. New York.

Jan. 15, 1947.

See, also, D.C., 66 F.Supp. 449.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libellant.

Hagen & Eidenbach, of New York City (Charles W. Hagen and Nelson J. Johnson, both of New York City, of counsel), for respondent.

J. Vincent Keogh, U. S. Atty., of New York City (Vincent A. Catoggio, Sp. Asst. U. S. Atty., and Gilbert S. Fleischer, both of New York City, of counsel), for respondent-impleaded.

INCH, District Judge.

Libellant, C. F. Harms Company, owned the scow Mars and chartered it, under the usual harbor charter, to the respondent, Erie Railroad Company. While under this charter the scow was damaged. Thereupon, libellant sued respondent and the latter impleaded the United States of America.

Libellant is entitled to a decree. The issue is whether such decree should be entered against respondent and the impleaded respondent or either of them.

Many of the facts are not in dispute. On September 13, 1944, while this Nation was in a state of war, and the question of furnishing supplies to the Armed Forces as promptly as possible was of great importance, the Erie Railroad received orders from the Government to load and deliver by lighter, to Pier 13, Staten Island, the contents of certain railroad cars con-

taining Army tanks then at the Erie Terminal, Wechawken, New Jersey.

The Erie thereupon proceeded to load as many of these tanks as possible on the scow Mars and when this loading was completed, in the morning of September 14, 1944, libellant's scow captain left the scow and went to New York on his own business without informing either the libellant or the Erie. The Erie tug Akron arrived at Weehawken at about 11 A. M., and finding no captain on the scow, proceeded to take her in tow and brought her down the river to Pier 13, Stapleton, Staten Island, arriving there about 1:45 P. M. The scow was not damaged while she lay at the Erie Terminal nor was she damaged during this trip to Pier 13.

Terwilliger, captain of the tug Akron, on arrival reported to the United States Army tug dispatcher at the end of Pier 13, and was then ordered by him to take the scow Mars, with her cargo, to the north side of Pier 14, and place her at a safe berth inside. This the captain of the tug proceeded to do. There were a number of other boats along this north side of Pier 14, but there was apparently a safe place about the third berth from the bulkhead where a single United States Army barge was moored. As there was no scow captain on board the scow Mars, the captain of the tug and his deck hands moored the scow Mars outside this Army barge with double lines and, as he testified, "all the lines that we could find on the scow". He then had his deck hands see to it that the said Army barge was likewise safely secured to the pier. Having seen to all of this, the Akron departed. At this time the scow Mars, loaded as aforesaid, was undamaged. There is nothing in the evidence to show or indicate that the presence of the scow captain was required then, or could have avoided injury to the scow later.

The above mooring of the scow Mars was completed about 2 o'clock in the afternoon. The weather was then not stormy and the wind was from the southeast, making the north side of Pier 14 a safer berth than the south side, so far as the then weather was concerned. During all this day however, it was known to all concerned, or should

have been known, that a hurricane was slowly approaching towards Long Island at a rate of about 16 miles an hour. Apparently the location of this hurricane, at the time in question, was in the neighborhood of Norfolk, Virginia. It did not reach New York until later that evening.

It is thus plainly established that the cargo of tanks as well as the scow herself had been placed by the Erie in the custody and care of the Government at Pier 14, subject to its being subsequently unloaded, where and when the Government should decide. It was also known, or should have been, to those representing the Government, as it was to the Erie tug, by the exercise of reasonable care in view of the nature of this custody that there was no scow captain on the scow Mars.

Thus the evidence shows that the scow Mars and her cargo was undamaged at the Erie Terminal at Weehawken, was taken from Weehawken to Pier 14 by the Erie tug undamaged, was thereupon safely moored at the designated pier and that the Government, under the circumstances, then took complete possession of both the cargo and the scow from that time on. Yet, several days thereafter the scow Mars was redelivered to the Erie by the Government and by it to libellant, with certain planks damaged. The Erie was therefore called upon to explain how this damage occurred and did so by impleading the Government which, as such bailee, had taken complete possession of both the cargo and the scow.

From this point, all the testimony taken at the trial as to when and how the damage of the scow was later received is most unsatisfactory. The impleaded Government apparently made up its mind that upon the arrival of the hurricane later in the day, this storm solely caused the damage and that therefore no one was liable. That there was a hurricane and that it could have damaged the scow can be assumed, but there is no proof, although same would seem available to the Government, that the scow did receive her damage from a hurricane. On the contrary this is left, by such failure of the Government, to speculation. Moreover, it appears from the evidence that the scow Mars was thereafter shifted by the Govern-

ment to various locations. On September 13, she was in south Brooklyn at the Army Base. On September 16, she was found damaged and she was then shifted to Pier 11, Staten Island, and that afternoon her cargo discharged. On September 17, she was shifted to Pier 17, Staten Island, and at this pier she was redelivered to the Erie in her damaged condition. Thereupon she was towed, by an Erie tug, to a dry dock at Weehawken for repair.

In this condition of the evidence, no finding by the court can be made that the scow Mars was damaged by the hurricane and it is just as reasonable to believe that the damage found on September 16 and on September 17, and after the scow had been so frequently shifted by the Government, could have resulted from carelessness on the part of those so shifting the scow. However, any such finding would also be without evidence to support it.

The result therefore is, that the previously undamaged scow Mars was returned to the Erie in a damaged condition by a bailee of the scow who had had complete custody of her, without giving any reasonable explanation of when and how such damage had been occasioned, although some definite proof or explanation could reasonably seem to have been available to such bailee.

In my opinion, in view of this state of the evidence, there has been no explanation by the Government as to when and how the scow Mars was damaged and under such circumstances, so far as libellant is concerned, there is a reasonable inference, unexplained, sufficient on which to find that the Government failed to exercise reasonable care for the safety of the scow Mars. Seaboard Sand & Gravel Corporation v. American Stevedores, 2 Cir., 151 F.2d 846.

As to the Erie Railroad, it was the charterer of this scow Mars. It was under a duty to use reasonable care. It could not delegate that duty to others. Seaboard No. 21, 2 Cir., 154 F.2d 399–402. I fail to find that it neglected that duty under the circumstances. It had taken the scow safely from Weehawken to Pier 14, Staten Island, and there tied her up with especial care for her safety.

A decree is directed against the United States of America. The libel against the Erie Railroad is dismissed without costs.

Submit findings of fact and conclusions of law.