Charles GURAL, as owner of the Craneboat THE NEW JERSEY, Libellant,

v.

TERRY CONTRACTING, INC.,
Respondent,
L. & J. Concrete Corporation,
Respondent-Impleaded.

United States District Court
S. D. New York.

Oct. 9, 1958.

---

7. See Golenpaul v. Rosett, 1940, 174 Misc. 114, 18 N.Y.S.2d 889.

8. Willson v. Graphol Products Co., 1951, 188 F.2d 498, 38 CCPA 1030.

Bigham, Englar, Jones & Houston, New York City, Donald M. Waesche, Jr., John G. de Roos, New York City, of counsel, for libellant.

Alexander, Ash & Schwartz, New York City, Edward Ash, New York City, of counsel, for respondent.

Gay & Behrens, New York City, James A. Hageman, New York City, of counsel, for respondent-impleaded.

LEVET, District Judge.

This is a suit brought by Charles Gural as libellant (hereinafter called "Gural" or "libellant") against Terry Contracting, Inc. (hereinafter called "Terry" or "respondent") to recover damages for the sinking of libellant's scow or craneboat, New Jersey, which occurred on October 28, 1955, in the Harlem River, New York City, while said scow was moored to an abutment of a bridge commonly known as the Third Avenue Bridge.

The respondent Terry impleaded L. & J. Concrete Corporation (hereinafter called "L&J" or "respondent-impleaded"), which had been engaged in loading the scow with broken concrete prior to the sinking.

After hearing the testimony of the parties, examining the exhibits, the pleadings and briefs submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### Findings of Fact

1. That at all times mentioned hereinafter the libellant Gural was the sole owner of the scow or craneboat, New Jersey.

2. That at all times hereinafter mentioned the respondent Terry was and still is a domestic corporation with an office and place of business located in the City of New York, within the Southern District of New York and within the jurisdiction of this court.

3. That at all times hereinafter mentioned the respondent-impleaded L & J was and still is a domestic corporation with its office and principal place of business located in the City of New York, within the Southern District of New York and within the jurisdiction of this court.

4. That in or about the month of October 1955, the respondent Terry was engaged as general contractor in repairing and improving the Third Avenue Vehicular Bridge, which spans the Harlem River in the City of New York and that included in said work was the demolition and removal of the old concrete roadbed of the bridge. (See S.M. 170.)

5. That on or about the 13th day of September 1954, the respondent Terry and respondent-impleaded L&J entered into a certain contract or subcontract whereby the said respondent-impleaded L&J agreed among other things to demolish and remove the existing pavement on the said bridge and to dispose of the said removed material, which material, broken concrete, was to be loaded on barges to be moored on the fender sys-

tem of the bridge. (See Exhibit A: S.M. 172.)

6. By said contract between Terry and L&J, L&J agreed among other things as follows:

"28. Should any person, or persons, or property be damaged or injured by the Subcontractor, or by any person, or persons employed under it in the course of the performance by it of this agreement or otherwise, whether by negligence or otherwise, said Subcontractor shall alone be liable, responsible and answerable therefor and does hereby agree, to and with the Contractor, to hold harmless and indemnify the Contractor of and from all claims, suits, actions, costs, counsel fees, expenses, damages, judgments or decrees by reason thereof."

7. That sometime on or about October 24, 1955, the respondent Terry entered into a written agreement with the libellant Gural, under the terms of which the said Gural was to furnish a scow to be placed alongside the said fender system into which scow the concrete rubble aforementioned could be loaded. This agreement was as follows:

"Monday, October 24, 1955

"This is your order to furnish an empty scow alongside the fender system of the swing span pier of the Third Avenue Vehicular Bridge on the Harlem River and to remove the scow and its contents of demolished roadway from the swing span and to dispose of the said contents.

"You will cover all insurance required on the scow and its towing and provide necessary permits.

"It shall be your responsibility to maintain this scow afloat while towing.

"The price for this work shall be . . . . . . $850.00

"The scow shall be delivered to the jobsite on Monday morning, October 24, 1955."

In my opinion, the above agreement between Gural and Terry contemplated a limited form of charter-demise of the New Jersey in the nature of a bailment during the loading operation.

8. On or about Sunday, October 23, 1955, the libellant Gural delivered the scow New Jersey at the fender system of the said bridge and moored it so that its port side was along the westerly side of the bridge fender.

9. The said scow New Jersey was a wooden deckscow, 100 feet long, 30 feet wide and 10 feet in depth. It had 6 inch side planks, 4 inch bottom planks, 6 to 9 keelsons, 2 interior longitudinal bulkheads and was X-braced throughout. A cabin, 6 feet wide, was located 2 feet from the stern of the scow, and at the time of her delivery to the jobsite a 30 ton crane with 10 foot tracks was located on the center line of the scow one foot forward of the cabin. (SM 19, 40–42.)

10. An examination of the scow immediately prior to its delivery by Gural showed that the seams were closed and that water in the scow existed only to the extent of 1½", and that at one end thereof. (SM 32–37.) It also appears that in August 1955, some 2½ months prior to the loss, the scow had been surveyed by a marine surveyor and was found to be staunch and seaworthy. (SM 134–137.) There appears to be no doubt, therefore, that the scow, at least at the time of the delivery, was seaworthy. The fact that some water came aboard did not of itself make it unseaworthy.

11. The broken concrete was loaded onto the scow by L&J as follows: Approximately 8 men were employed; 3 of the men gathered the concrete in piles and 2 or 3 maintained the ramp or the planks on the scow, while 2 others operated the two wheelbarrows, conveying the material to the scow. The concrete was spread over the flat surface in a fairly level area of about 20 x 20 feet, perhaps 20 to 25 feet back from the bow end of the scow. (SM 217–218.)

12. The libellant Gural conceded that during the period of the loading the following acts or conversations took place:

(1) That on Monday, October 24, he had a conversation with Megill, superintendent of Terry, and that he told Megill that he, Gural, would be in every day to "check" the loading. (SM 42–43.)

(2) That he went to the site of the scow on Tuesday, October 25, at which time some concrete had been loaded at the bow end; that he came back in the afternoon sometime past noon, at which time additional concrete had been loaded, apparently a certain distance from the bow end of the scow. (SM 44–47.)

(3) That he inspected the scow on Wednesday, October 26, in the morning. (SM 47–48.)

(4) That on the evening of October 27, he examined the scow and found a slight list to the starboard side; he did certain pumping, and finding a seam open, caulked the seam. (SM 49–52, 59, 69, 81.)

(5) That he had observed the loading of the scow and particularly that the loading was being concentrated on too small an area; that it was not being loaded properly, but that he did not tell anyone to stop the loading. (SM 59, 69, 73–74.)

(6) That about October 25 he brought up a part-time employee by the name of Orsini and instructed Orsini to call him if the scow ever took on any water (SM 77); that he had told Orsini to be present on the morning of the 28th. (SM 96–97.)

13. While, as appears from the foregoing, Gural and his employee made frequent visits to the scow, I do not believe that he at any time undertook to man the scow during the loading operation.

14. Megill testified that at the time when the scow was first brought on the job he questioned Gural about the scow and Gural stated in effect that it would handle the material; that he had had some 500 or 600 tons on it; that it was a good boat; there would be no trouble about it, and that Gural said he would trim the load with the crane. (SM 181–182.) Megill observed that Gural had to straighten the load before it went out

[redacted]

anyway. (SM 207.) Gural undoubtedly intended to use his crane to straighten the load prior to the commencement of the towing operation. However, I have concluded that he at no time undertook to trim the load while loading was continuing.

15. The scow sank on October 28. The night before the men had worked until 4:15 P.M., at which time the scow was slightly lower at one corner at the bow end on the right side and some 10 to 12 inches off level keel. From the deck of the scow the freeboard was about 5 feet. (SM 224–225.) On the morning of the 28th at about 8:00 o'clock the scow was slightly deeper at the bow end with less than 4 feet of freeboard (SM 225), and Greenan, the supervisor for L&J, noticed that the scow was taking water. (SM 262.) On the morning of the 28th, in spite of the fact that he noticed these conditions, Greenan loaded perhaps 8 tons or more on the surface of the scow without pumping. At about 1:00 o'clock or right after lunch, Greenan requested Terry's man to pump, at which time the freeboard was only 3 feet or a couple of inches less. (SM 261–263.) Thereafter, one of Megill's men attempted to pump the scow out, but the scow sank. (SM 179–181.)

16. The manner in which the concrete was taken aboard as aforesaid created a tendency to twist, to open the seams and to cause listing of the scow. More of the concrete should have been loaded on the after end and carried forward by reason of the location of the 30 ton crane and cabin on the aft end of the scow. (SM 137–138, 152–153.) Apparently, anywhere between 60 and 80 tons of concrete were loaded at the rate of perhaps 15 to 20 tons a day. (SM 154, 159.)

17. Despite the loading method employed, the scow would, in my opinion, have remained afloat if the loading had been stopped on the evening of the 27th and timely pumping commenced on the morning of the 28th. Accordingly, I have concluded that L&J's continued loading of the scow and its failure to

promptly commence pumping operations on the morning of the 28th, at a time when the scow was taking on water and was in an obviously precarious state, was the proximate cause of the scow's sinking.

18. The respondent and respondent-impleaded have failed to sustain the burden of establishing that negligence on the part of Gural contributed to the sinking of the scow. While it is true that Gural as late as the evening of the 27th knew and disapproved of the manner in which the concrete was being loaded, he could not, in my opinion, have reasonably anticipated either that the scow would be in the precarious condition in which it was found on the morning of the 28th or that L&J would under such circumstances have continued with the loading.

### Discussion

■ L&J's continued loading of the scow on the morning of October 28, coupled with its failure either to promptly undertake pumping operations or to request that Terry do. so, constituted negligence for which L&J is liable. The Carbon Light, D.C.S.D.N.Y.1946, 66 F. Supp. 292, affirmed O'Brien Bros. v. United States, 2 Cir., 1948, 171 F.2d 586; The Henry E., D.C.E.D.N.Y.1945, 61 F. Supp. 327, affirmed F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., 2 Cir., 1947, 162 F.2d 90; see also McGeeney v. Moran Towing Corp., 2 Cir., 1945, 149 F.2d 791.

■ The delivery of the scow by the libellant Gural to respondent Terry, in my opinion, constituted a limited form of charter-demise in the nature of a bailment. See Salmons Dredging Corp. v. Herma, 4 Cir., 1950, 180 F.2d 233. Although Gural was charged with maintaining the scow afloat "while towing," there was no such assumption of responsibility by Gural while the scow was moored to the jobsite. Therefore, a responsibility of care rested upon Terry as bailee and this responsibility could not be delegated. In Seaboard Sand & Gravel Corporation v. Moran Towing Corporation, 2 Cir., 1946, 154 F.2d 399, the court in holding a sub-charterer bailee liable under similar circumstances, stated:

"It is the duty of a charterer, as bailee, to care for a vessel while it is under charter to him and he cannot delegate that duty to others. While he does not warrant the safety of the vessel intrusted to him, he does have an obligation to have her properly cared for by any person to whom he intrusts the vessel and is liable for the acts of negligence of the person to whom he intrusts her. * * *" 154 F.2d at page 402.

To the same effect see O'Donnell Transp. Co., Inc. v. M. & J. Tracy, Inc., 2 Cir., 1945, 150 F.2d 735 and cases cited therein. Hence, although L&J is primarily responsible under the doctrine of negligence, Terry is responsible as a bailee.

■ The respondent and the respondent-impleaded claim that Gural's own negligence was the proximate or contributing cause of the accident. The rule in admiralty is well settled that the burden of proving contributory negligence is on the party or parties asserting it. W. E. Hedger Transp. Corp. v. United Fruit Co., 2 Cir., 1952, 198 F.2d 376; The Anna O'Boyle, 2 Cir., 1941, 124 F. 2d 180; The Nellie, D.C.E.D.Pa.1904, 130 F. 213; see also La Guerra v. Brasileiro, 2 Cir., 1942, 124 F.2d 553, 555–556. The respondent and the respondent-impleaded have, in my opinion, failed to sustain this burden. They claim that Gural breached some obligation to care for the scow during the loading operation. There is no proof of any such obligation. It is true that Gural or his employee made daily visits to the scow but such conduct without more does not impose such a legal obligation. No evidence was adduced to establish that Gural had undertaken to man the scow during the loading operation or that his visits to the scow were relied upon by either the respondent or the respondent-impleaded to their detriment.

Respondent and the respondent-impleaded claim that Gural knew of and by silence acquiesced in L&J's loading

methods. Gural neither knew of, nor is it reasonable to assume that he would under any circumstances have acquiesced in, the events which took place on the morning of October 28.

 The agreement between libellant Gural and respondent Terry contained this statement: "You [Gural] will cover all insurance required on the scow and its towing and provide necessary permits." Terry claims that this required Gural to carry marine insurance not only for his own benefit, but for the benefit of Terry. Since Gural took out no insurance for the benefit of Terry, Terry contends no liability to Gural results. There was no requirement in the agreement necessitating such insurance; if it were to be secured, this agreement could have easily so stated. There is no evidence that the parties intended to provide insurance against L&J's negligence for the benefit of Terry. Certainly no intention to cover Terry as bailee was indicated.

By virtue of the indemnity clause in the contract between Terry and L&J, Terry is entitled to indemnity from L&J. See A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring Co., Inc., 2 Cir., 256 F.2d 227.

The libellant is entitled to a decree directly against the respondent-impleaded L&J. 56th Rule in Admiralty, 28 U.S.C.A.; 2 Benedict on Admiralty, § 351, p. 538; The Pennsylvania Railroad Company v. The S.S. Beatrice, D.C.S.D.N.Y. 1958, 161 F.Supp. 136.

### Conclusions of Law

1. This court has jurisdiction of the subject matter of this suit and of the parties hereto.

2. This suit is within the admiralty and maritime jurisdiction of this court.

3. The libellant is entitled to an interlocutory decree against respondent-impleaded L&J.

4. The libellant is entitled to an interlocutory decree against respondent Terry for any balance which libellant is unable to collect or enforce against respondent-impleaded L&J.

5. The cross-claim for indemnity by respondent Terry against respondent-impleaded L&J is granted and respondent-impleaded L&J shall reimburse respondent Terry for any damages paid by it to the libellant herein.

6. The libellant is entitled to a provision in the said interlocutory decree providing for the reference to a Commissioner of the damages to which he is entitled, with costs and interest, if any, as determined by this court, upon the entry of the final decree herein.

Submit decree in accordance with the foregoing.