**James F. REGAN, Plaintiff,**

v.

**COMPAGNIE NATIONALE AIR FRANCE, Defendant.**

**No. 62–C–199.**

United States District Court
E. D. New York.

April 28, 1965.

Tell, Cheser, Werner & Breitbart, New York City, for plaintiff; Charles Werner, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant; Douglas B. Bowring, New York City, of counsel.

ZAVATT, Chief Judge.

Plaintiff herein, James F. Regan, has instituted this action for $250,000 in damages against Compagnie Nationale Air France (hereinafter Air France) alleging that he sustained damages in the sum of $250,000 as a result of injuries

sustained because of defendant's negligence. In substance, the alleged negligence consists of Air France's failure to maintain certain Air France equipment in a safe, proper and secure condition and of furnishing or supplying said equipment to plaintiff's employer, Seaboard World Airlines (hereinafter Seaboard), without notifying it of the defective condition. The answer of Air France denies any such negligence and, in substance, alleges that the injuries complained of resulted from the negligence and carelessness of the plaintiff. After a full trial of this action, and for the reasons hereinafter stated, it is the finding of this court that the plaintiff has failed to establish the necessary elements of his allegations and that the complaint herein must be dismissed.

On June 28, 1961, the date on which his injuries were sustained, the plaintiff was employed by Seaboard as a cargo serviceman at Seaboard's Kennedy Airport terminal. In this capacity, plaintiff's duties included the loading and unloading of aircraft in conjunction with several other co-employees operating in a team. In the loading and unloading of air freight these teams utilize wooden pallets, which are lifted on the blades of a hydraulic fork lift to the hatch opening of the aircraft. These pallets are of basically two varieties: (1) the flat pallet; and (2) the three-sided pallet. Both types are of wood construction with a flat (closely planked) platform upon which the freight is placed. Each type has cross pieces below the flat platform so that when the pallet is placed on the fork lift the blades of the lift fit between the platform and the cross pieces. These cross pieces do not contribute to the weight holding capacity of the pallet. They appear to serve two purposes: (1) to space the distance between the flat platform of the pallet and the ground so that the blades of the fork lift can be readily inserted; and (2) to lend a limited degree of stabilizing support to the pallet in the event that it begins to tip on the blades of the fork lift. In this regard, the flat pallet was described as "far more sturdier" in that it has three cross pieces contrasted with only two on the three sided pallet.

One further distinction should be noted between the two types of pallets under consideration. When these pallets are being utilized on a folk lift, there is an "over-hang" of the pallet beyond the blades of the fork lift and there is considerably more "over-hang" on the three sided pallet. Thus, while there appears to be very little over-hang of the flat pallet the evidence discloses that even with the blades of the fork lift at maximum (5' to 5½') spread, the three sided pallets have an over-hang of 8" to 9" on each side.

On the night of the mishap, the plaintiff and five other men were assigned to the unloading of a Seaboard aircraft which had arrived at the Seaboard ramp. This team, with the exception of the one man who was to operate the fork lift, boarded the aircraft from the rear and proceeded to untie the freight situated in the rear compartment. As part of this procedure, the fork lift operator proceeded to the open area where Seaboard stored its pallets; placed two of the flat Seaboard pallets (Seaboard owned *only* flat pallets) on his lift; transported them to the rear hatch; lifted the blades of the fork lift so that the platforms of the pallets were level with the hatch. The plaintiff and another cargo man positioned themselves on these pallets and stacked thereon the freight that was passed out to them. When the pallets were fully loaded the lift was lowered and they were transported to the Seaboard warehouse. This was the standard unloading procedure which was repeated twice, using flat Seaboard pallets, until the rear compartment had been fully unloaded.

At that point, approximately 7:30 P.M., the plaintiff and his team members proceeded to the forward hatch, untied the cargo stored therein, and awaited the arrival of the fork lift carrying two pallets. It is at this point that the standard procedure described above was deviated from. When the fork lift operator reached the area where pallets are stored, he de-

cided to use a flat pallet and a three sided pallet which had been stacked with the flat Seaboard pallets. Although this matter was disputed at the trial, the evidence clearly indicates and the court so finds, that this three sided pallet (the only such pallet then stored at the Seaboard ramp) was in fact owned by Air France and may have been delivered to the Seaboard area the day before by someone. Exactly *who* delivered this Air France pallet to Seaboard; when it had been delivered; when it had last been under the control of Air France; and the propriety of using that pallet in unloading Seaboard freight, will be considered below.

It is apparent that the fork lift operator, as well as all of the members of the cargo team who used this pallet, were aware of the fact that it was not owned by Seaboard; that, in fact, it was owned by defendant Air France. Notwithstanding the fact that the pallet was not the property of Seaboard, the fork lift operator placed it on the trailing edge of his blades, followed by a flat Seaboard pallet on the leading edge thereof, and proceeded to the forward hatch of the aircraft. The blades carrying these two pallets were then lifted to the forward hatch where the other members of the team were waiting. Although the operator examined the cross pieces of the Air France pallet as he raised it to the hatch, he did not observe any defects. The plaintiff was at the hatch door as the cargo man who was to stack the freight on the pallets. He decided to load first a piece of freight which was about 2½′ in length by 10″ or 12″ in height. Although he did not then know its exact weight (which was 145 kilos or over 300 pounds) he realized that it was too heavy to lift. Contrary to the Seaboard Instruction Manual, the plaintiff proceeded to move this piece of cargo from the aircraft, over the flat Seaboard pallet, and onto the three sided Air France pallet by "walking" it end over end on its corners. Plaintiff who had never loaded a three sided pallet before proceeded to load the Air France pallet as he had always loaded the flat Seaboard pallets—by proceed-

ing to place the first piece of air freight (this three hundred pound crate that he could not lift) at the far left hand corner of the Air France pallet. As he approached this point with this cargo, the pallet tipped to the left and fell to the ground, a distance of approximately fifteen feet, carrying both the plaintiff and the crate with it. Subsequent examinations of the pallet disclosed that the two cross pieces running under the pallet had given way when the pallet tipped under the weight of the cargo and of the plaintiff.

■ Plaintiff's entire case is predicated upon the contention that this pallet was "supplied" to Seaboard by Air France; that there existed between Seaboard and Air France a bailment for mutual benefit; that, owing to the custom then in force among the various air freight companies at Kennedy Airport, these pallets were used interchangeably regardless of ownership. It is the finding of this court, however, that the pallet in question was not "supplied" to Seaboard by Air France; that there existed no bailment for mutual benefit; that there is no credible evidence as to who delivered the pallet to Seaboard or when that pallet was last under the control of Air France; and that there is no such custom of supplying pallets owned by one company to be used interchangeably with those owned by another.

■ Plaintiff has stressed the fact that there is a "custom" at Kennedy Airport which dictates that, when a loaded pallet of Company A is brought to the ramp of Company B—usually in conjunction with a freight transfer from A to B, Company B is free to use that pallet after it has been unloaded interchangeably with the pallets owned by Company B. It is alleged that, pursuant to this "custom," Company B will continue to use the pallet owned by Company A until it is passed back to Company A in conjunction with a freight transfer from B to A. There may even be cases, under this alleged "custom," where Company B may later reload Company A's pallet and transfer it to Company C, thereafter

leaving Company C free to use Company A's pallet as long as it chooses. It is true that several members of plaintiff's cargo team testified that it is *their* custom to use any pallet found in the Seaboard area, but this appropriation by the cargo men hardly supports the contention that the companies themselves condone such a practice or entertain any such "custom." These cargo men were neither told to use nor told not to use pallets owned by another company; rather, they took it upon themselves to do so. The court finds that this alleged "custom" was accurately described by one of plaintiff's witnesses, a cargo supervisor, as "strictly a custom of cannibalization, you use whatever you get your hands on."

Assuming, *arguendo*, that there was a defect in the Air France pallet (and it must be noted that even this has not been adequately established), it is apparent that the defendant did not violate any duty it owed to the plaintiff with respect thereto. Plaintiff states in his post trial brief that this was a bailment for mutual benefit due to the "custom" existing between the various companies; that Air France "would receive and use for its own purposes pallets owned and supplied by other airlines" and that "[d]efendant expected and knew that its pallets, supplied to other airlines, would be similarly used by them." This contention is contrary to the credible evidence established at the trial.

The credible evidence in this case indicates that Air France did not even deliver this pallet to the Seaboard ramp, let alone "supply" it to Seaboard for use in Seaboard's business. The records of Air France kept in the regular course of business show that Air France made no freight transfers to Seaboard during the entire month of June 1961. Although the court urged plaintiff's counsel to introduce Seaboard's records in this regard, he chose not to do so. The court can reach only one of two conclusions: either the Air France pallet had been delivered to Seaboard prior to June 1961 and used repeatedly by Seaboard for at least a month prior to the accident; or the pallet had been in the possession of a third, unidentified freight company—or possibly a multitude of other companies for an unknown length of time and was delivered by one of them to Seaboard sometime prior to the accident. In neither event can Air France be held liable for wear and tear which may have taken place between the time that the pallet last left Air France and June 28, 1961.

Under these circumstances, plaintiff's reliance upon cases such as La Rocca v. Farrington, 301 N.Y. 247, 93 N.E.2d 829 (1950) and De Maria v. Renee Operating Corp., 282 App.Div. 221, 122 N.Y.S.2d 236 (1st Dep't 1953) (per curiam), is misguided. In the La Rocca case the owner of a heavy duty tractor crane, who was in the business of renting such equipment, had rented it to one of the defendants who, in turn, rented it to the plaintiff's employer. In De Maria, the plaintiff was employed by a construction subcontractor and was injured by a defect in equipment leased by the defendant to his employer. These cases merely state the well established rule that a supplier (such as an equipment rental company or a lessor) may be liable for injuries resulting from discoverable defects. But this liability arises only upon the existence of a duty. Owing to the unlawful possession of this pallet by Seaboard, it cannot be said that Air France owed any such duty. It is true that, if a bailment had in fact been created by operation of law, the fact that Air France did not directly deliver this pallet would not necessarily be controlling. But such a bailment is dependent upon lawful possession by the bailee and the plaintiff has failed to establish that essential element. See, e.g., Seaboard Sand & Gravel Corp. v. Moran Towing Corp., 154 F.2d 399 (2d Cir. 1946).

Notwithstanding the absence of any duty owing to plaintiff by defendant, there is no evidence herein which would justify the conclusion that the mishap resulted solely as the result of any negligence of the defendant. If the cross pieces were in disrepair, and if this de-

fect was the proximate cause of the accident, the court has no evidence as to when they fell into disrepair, at whose hands this occurred, or what their condition was at the unknown time when the pallet was last in defendant's possession and control. On the contrary, there is evidence, and the court so finds, that a proximate cause of this accident was the plaintiff's own negligence in placing this 300 pound crate near the far left corner of the otherwise empty pallet.

The plaintiff has failed to establish a right to recover as against defendant Air France. The complaint should be dismissed. This opinion constitutes the court's findings of fact and conclusions of law.

Settle an order consistent herewith on or before ten (10) days from the date hereof, together with any requested additional proposed findings of fact and conclusions of law.