**LUIS VENTURA, Plaintiff**

v.

**T. ARTHUR PEARSON, M.D., Defendant**

Civil No. 60-1980

Territorial Court of the Virgin Islands

Div. of Christiansted at St. Croix

July 31, 1980

MARK L. MILLIGAN, ESQ., Christiansted, St. Croix, V.I., *for Plaintiff*

JONATHAN M. ROGERS, Christiansted, St. Croix, V.I., *for Defendant*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION

Plaintiff, who is in the diesel repair business, brought this action, under the legal theories of breach of contract and debt, seeking compensation for labor performed on two vessels owned by the defendant. Defendant has filed a counterclaim for return of the vessels alleged to be in plaintiff's possession; and further, for damages allegedly incurred as a result of negligence on the part of plaintiff as bailee, or alternatively, as a result of plaintiff's breach of a contract to maintain the vessels.

For the reasons set forth below, plaintiff shall recover in quantum meruit for the reasonable value of his pre-hurricane services. Defendant shall be denied recovery for the damage sustained by the vessels but shall be granted replevin of all of the vessels' parts in the possession of plaintiff.[1]

In February of 1979, defendant owned two inoperable motor vessels, the LA PALOMA and the TAPPY, which were moored at the Comanche dock in the Christiansted harbor. He contacted plaintiff, with whom he had had no prior business or personal dealings. A meeting followed at which the parties discussed the possibility of

---

[1] Although certain parts and accessories were in the possession of plaintiff at the institution of this action, the vessels themselves were never in his possession.

plaintiff rendering operable and/or maintaining the vessels and the payment of some kind of compensation in cash or in kind.

The following day, the parties together inspected the vessels and plaintiff began mechanical repairs on the LA PALOMA. Since access to the LA PALOMA and her engines was necessary, defendant soon gave plaintiff a key to the engines.

Repairs were still in progress when at the end of July the lease-holder of the Comanche dock, from whom the defendant had been subleasing space, effectively terminated the subleasing arrangement by hiring someone to remove the vessels from the dock and to anchor them in the Christiansted Harbor. Plaintiff continued making repairs, going back and forth to the vessels in defendant's dinghy which was entrusted to plaintiff for that purpose.

Sometime in early August 1979, plaintiff replaced the anchor securing the boats with his own anchor. He utilized his anchor because he had no acceptable alternative since the person who had anchored the vessels in the harbor demanded that his anchor be returned and defendant was unwilling to furnish anything other than a 20 lb. anchor which he, plaintiff, deemed inadequate for mooring. Plaintiff repeatedly suggested that defendant obtain adequate anchors of his own.

In mid August 1979, at defendant's request, plaintiff towed the TAPPY to the Yacht Club behind the LA PALOMA. He anchored her with defendant's 20 lb. anchor and two twelve inch cement blocks. He then returned the LA PALOMA to the Christiansted harbor to continue repairs and anchored her, again using his own anchor. His warnings to the defendant that a proper anchor should be purchased were resumed, but without avail.

When Hurricanes David and Frederick swept past St. Croix in late August 1979, the moorings of the vessels proved inadequate. The TAPPY ran aground and the LA PALOMA sank in shallow water, each sustaining extensive damage.

Up until the time of the hurricanes, all work performed on the vessels by plaintiff was done with the full knowledge and consent of the defendant. This repair work frequently consisted of removing a malfunctioning part, purchasing a new part or hiring someone to repair the old part and installing the new or repaired part. Defendant did not pay plaintiff for his labor but did pay for all parts and for all labor performed by the third persons (except for the services performed by Ramon Bermudez, a diesel mechanic hired and paid by plaintiff). Plaintiff's work can best be characterized as boat

repair as opposed to boat maintenance. Plaintiff never used the vessels for either personal or commercial use.

After the hurricanes, defendant told plaintiff he was not to perform any more work on the engines unless authorized in writing to do so. Nevertheless, plaintiff took them to his home to rebuild them. Once the boats were raised, he cleaned the oil from them and made daily trips to bail them out. When he, for the first time, demanded compensation for his labor, defendant refused to pay him. Plaintiff then refused to return the parts from the boats which he had in his possession. This suit followed.

Plaintiff contends that under the terms of an express oral contract entered into by the parties at their first meeting, he is entitled to recover monetary compensation for all repair work he performed on the boats. He claims that at the initial meeting, the defendant, in effect, made two separate offers: (1) to pay him for labor and parts if he would agree to make the vessels operable; and (2) to grant to him unfettered use of the vessels if he would agree to maintain them and to pay defendant an unspecified percentage of profits generated by any commercial activities for which the plaintiff might use them. It was plaintiff's testimony that he accepted the defendant's first offer, that is, he agreed to make the vessels operable, although no amount or method of computing compensation was discussed. He claims, however, that he rejected the second offer, telling defendant that he could not maintain the vessels since various unrelated commitments frequently required him to be off island.

Defendant has a different recollection of the meeting. He claims that he made only one offer to the plaintiff, namely, to pay for parts and to permit the plaintiff to use the vessels for whatever purposes he might wish in exchange for his promise to make operable and maintain the vessels. He asserts that monetary compensation was not discussed.

■■ The creation of a contract requires mutual manifestation of assent. Restatement of Contracts § 20 (1932).[2] This almost invariably takes the form of an offer by one party which is accepted by the other party. Id. § 22. In analyzing an offer and acceptance, it is important to determine whether the offeror actually made an offer or simply invited the other party to make an offer and, if an offer was in fact made, whether it was so definite in its terms or required such definite terms in the acceptance, that promises and perform-

---

[2] 1 V.I.C. § 4 makes the A.L.I. Restatements the rule of decision in the Virgin Islands absent local law to the contrary.

ances to be rendered by each party were reasonably certain. See, Id. §§ 25, 32.

■ In this case, the parties do not agree on what offer was made or accepted. Their versions differ as to the services to be rendered as well as the quantum and type of compensation to be paid. The Court does not find one party's version to be more correct or believable than the other's. Rather, it finds the possibility of continuing maintenance and the possibility of compensating plaintiff for his repairs and/or maintenance by permitting him to use the vessels were discussed but never agreed upon. The parties discussed entering into a contract and each suggested the nature of the contract he was willing to enter into, but the evidence indicates that the negotiations never reached the stage where an offer was actually made. Even assuming an offer was made in the course of the discussion, it is clear from the testimony that any such offer was so vague and indefinite that the character of the purported contract was not fixed by the agreement of the parties. No definite offer having been made and accepted, plaintiff cannot recover for his labor under an express contract theory.

■■ Recovery in quantum meruit is sometimes appropriate where services are rendered under an agreement which fails, for one reason or another, to become binding on the parties. The basis for such recovery is established by § 40(b) of the Restatement of Restitution (1937) which in pertinent part provides:

> A person who has rendered services to another or services which have inured to the benefit of another or who has affixed chattels to the land or chattels of another is entitled to restitution therefor if the services were rendered or the chattels were affixed:
>
> (a) to obtain the performance of an agreement with the other therefor, not operative as a contract, or voidable as a contract and avoided by the other party after the services were rendered, the one performing the services erroneously believing because of a mistake of fact that the agreement was binding upon the other . . .

■ The Court finds that prior to the hurricanes, plaintiff rendered services for defendant, that the services inured to the benefit of defendant, that services were rendered to obtain defendant's performance under the inoperative oral contract, and that plaintiff erroneously believed the contract to be binding upon defendant.

Accordingly, plaintiff is entitled to recover for his pre-hurricane services.

■■ Services performed after the hurricane, however, stand on different ground. Since defendant specifically ordered plaintiff to cease making repairs, plaintiff could not reasonably have believed the prior inoperative oral contract to be binding upon defendant. Further, the Court notes that according to plaintiff's testimony, the reason he performed services after the hurricanes was that he felt it was necessary to preserve the vessels and their parts from further damage by the elements. While one is sometimes permitted to recover for services rendered in the preservation of another's property, as a condition for such recovery the person rendering the services must have no reason to believe that the owner did not desire him so to act. Restatement of Restitution § 117 (1937). That condition is not met in this case. For these reasons, compensation for the post-hurricane work must be denied.

■ The measure of recovery in cases where there has been no tortious conduct on the part of the recipient of the services and where both parties are equally at fault, is the value of the actual benefit realized. Restatement of Restitution § 155(1) (1937).[3] This value is generally considered to be the amount for which the services could be obtained under like circumstances. U.S. for Use of F. E. Robinson Co. of N.C. v. Alpha-Continental, 273 F.Supp. 758 (E.D. N.C. 1967), affirmed Ling Electric, Inc. v. Federal Insurance Co., 406 F.2d 561 (4th Cir. 1969), cert. denied, 395 U.S. 922 (1969). The defendant's expert gave testimony concerning the amount of time reasonably necessary to effect the pre-hurricane general repairs on the LA PALOMA. The Court finds that the repairs performed by plaintiff and the expert's estimate of hours reasonably necessary to complete each task are as follows:

| Pre-Hurricane Labor on the LA PALOMA | Expert's Estimate of Hours |
|---|---|
| (1) tested and recharged batteries | 4.15 |
| (2) removed 2 starters | 6.0 |

---

[3] § 155 in pertinent part provides: "Where a person is entitled to restitution from another because the other, without tortious conduct, has received a benefit, the measure of recovery for the benefit thus received is the value of what was received, limited, if the recipient was not at fault or was no more at fault than the claimant, to its value in advancing the purposes of the recipient . . .".

113

| Pre-Hurricane Labor on the LA PALOMA | Expert's Estimate of Hours |
|---|---|
| (3)  installed 2 starters | 3.0 |
| (4)  disassembled transmission | 8.0 |
| (5)  diagnosed and removed 2 injector pumps | 8.0 |
| (6)  reinstalled 2 injector pumps | — |
| (7)  removed 2 radiators | 5.0 |
| (8)  reinstalled 2 radiators | 5.0 |
| (9)  removed fuel tank | 12.0 |
| (10)  installed fuel tank | 12.0 |
| TOTAL | 63.15 |

The expert gave no estimate of time allocable to reinstalling the injector pumps. Plaintiff's estimate for that task, 4.5 hours, is the only one available to the Court and will be added. Thus, 67.65 hours is found to be the time reasonably expended by defendant on general repairs to LA PALOMA.

Defendant's expert also testified that a reasonable charge for labor of the kind described, ranges between $20.00–$25.00/hour. The Court finds that $18.50 is a reasonable hourly rate for services.[4] Thus, plaintiff should receive compensation for general repairs on the LA PALOMA calculated by multiplying 67.65 hours × $18.50 for a total of $1271.53.

The Court also finds that plaintiff assisted a diesel mechanic in rebuilding the LA PALOMA's engines.[5] The diesel mechanic as did the plaintiff, testified that mechanics customarily bill by the cylinder, rather than by the hour, when rebuilding engines. A reasonable rate in 1979 was $200.00/cylinder. The LA PALOMA's engines had 12 cylinders. Thus $2,400.00 would be a reasonable rate for their rebuilding.

Lastly, the Court finds that the defendant made minor repairs on the TAPPY's bilge pumps and electrical connections. Since no evidence was presented concerning the time spent on these tasks, the Court is unable to compute a reasonable compensation.

---

[4] Plaintiff testified that if he had been working on an hourly basis, he would have billed at the rate of $12 to $16 per hour. I have adopted the median between the highest hourly rate suggested by defendant's expert and the lowest hourly rate suggested by the plaintiff as representative of the reasonable hourly rate.

[5] See facts, page (3) supra.

In summary, the Court fixes the compensation to which the plaintiff is entitled as follows:

| | | |
|---|---|---|
| (1) | general repairs on the LA PALOMA | $1271.53 |
| (2) | engine repairs on the LA PALOMA | 2400.00 |
| (3) | repairs on the TAPPY | — |
| | TOTAL RECOVERY | $3671.53 |

Parenthetically, the Court notes that the reasonableness of this award is supported by plaintiff's testimony that he performed the services intending to charge the defendant a flat rate of $4,000.00, a sum not substantially in excess of the Court's award. It was only when the instant dispute arose between the parties that plaintiff increased the demand for payment.

As a counterclaim, the defendant alleges that the plaintiff breached his contract to care for and maintain the vessels by improperly anchoring them. However, the Court's conclusion of law that an understanding on this point was not reached by the parties precludes recovery under an express contract theory, and its finding of fact that the plaintiff did not undertake to maintain the boats before the hurricanes precludes recovery under an implied contract theory.

As an additional counterclaim, defendant alleges that a bailment existed between the parties as to the TAPPY and the LA PALOMA and that plaintiff, as bailee, is liable for the loss caused by his negligent care, maintenance and anchoring of the vessels.

In order to create a bailment, possession of the subject property must pass from the bailor to the bailee. Generally, this takes the form of a delivery by the bailor and an acceptance by the bailee. In bailment of vessel cases, delivery and acceptance sufficient to create a bailment of a vessel typically occurs where one leaves a vessel at the boatyard or pier of another for purposes of storage or repair, Buntin v. Fletchas, 257 F.2d 512, 513 (5th Cir. 1958); Chandler v. Wayfarer Marine Corporation, 302 F.Supp. 282 (D. Me. 1969); or where one charters a vessel from another, Leaseboard Sand and Gravel Corporation v. Moran Touring Corp., 154 F.2d 399 (2d Cir. 1946).

Here, plaintiff merely undertook repairs on boats kept on premises not his own. He possessed the key to the LA PALOMA and the defendant's dinghy, merely for the purpose of gaining access to

the boats. In short, no delivery and acceptance sufficient to create the necessary possession is found here.

Finally, the defendant alleges that plaintiff has refused to return the vessels entrusted to him, despite demands therefore. As to the vessels themselves, this allegation is without merit. The TAPPY and the LA PALOMA were at all times in the possession of the defendant and were, in fact, sold by him after the hurricanes.

██ The plaintiff has, however, refused to return certain equipment from the vessels which he had taken to his house for repair or for other purposes prior to this lawsuit. The Court finds that at the time this lawsuit was commenced, the plaintiff had in his possession two engines and two radios from the vessels, that the defendant has the right to immediate and exclusive possession of the articles as against the plaintiff, and that the plaintiff's detention of them is unlawful. The defendant is therefore entitled to their return.

██ As to the dinghy, the Court finds that a bailment existed and that the plaintiff left it at the Yacht Club pursuant to defendant's instructions. Accordingly, plaintiff is excused from its redelivery.