**SHAMROCK TOWING CO., Inc.**, as owner of **THE** scows **SHAMROCK NO. 75** and **THE THOMAS J. GANTLEY**, Libelant,

v.

**HUGHES BROTHERS, INC.**, Merritt-Chapman & Scott Corp. and Concrete Conduit Corporation, Respondents.

United States District Court
S. D. New York.
May 4, 1961.

9. Count 4 is to the same effect with respect to the year 1956.

Alexander, Ash & Schwartz, New York City, for libelant; Edward Ash, New York City, of counsel.

Hill, Rivkin, Middleton, Louis & Warburton, New York City, for respondent Hughes Brothers, Inc.; Henry C. Eidenbach, New York City, of counsel.

Foley & Martin, New York City, for respondent Merritt-Chapman & Scott Corp.; John H. Hanrahan, Jr., New York City, of counsel.

Macklin, Speer, Hanan & McKernan, New York City, for respondent Concrete Conduit Corp.; Gerald J. McKernan, New York City, of counsel.

DIMOCK, District Judge.

In this admiralty suit, libelant, Shamrock Towing Co., Inc., hereinafter "Shamrock", seeks to recover compensation for damage to its two deck scows, Shamrock No. 75, hereinafter "the No. 75", and Thomas J. Gantley, hereinafter "the Gantley". Shamrock alleges that the damage was caused by the negligence of respondents Concrete Conduit Corporation, hereinafter "Concrete Conduit", and/or Merritt-Chapman & Scott Corp., hereinafter "Merritt-Chapman", in loading the scows. Shamrock further alleges that respondents Hughes Brothers, Inc., hereinafter "Hughes", and Merritt-Chapman were respectively charterer and sub-charterer of the scows. Shamrock seeks to hold all three liable for compensation for the damage.

I shall consider first the question of the liability of Concrete Conduit for the damage to the No. 75, then the liability of Hughes and Merritt-Chapman for that damage. Then I shall consider the liability of the respective respondents for the damage to the Gantley in the same order.

At the root of the trouble is the loading of heavy concrete girders with pieces of dunnage between them and the decks of the scows instead of directly upon the decks. The result of the use of the dunnage was that the weight of the girders, instead of being distributed, was concentrated at two points and broke the members supporting the decks. In opposition to Shamrock's position it is claimed, among other things, that the girders were what is known as pre-stressed and could not be laid flat on the deck since they would not stand contact except at the two points where they rested on the pieces of dunnage and that Shamrock consented to the manner in which they were loaded.

Precrete Inc., a corporation under the same control as Concrete Conduit, gave an order to Merritt-Chapman to transport by scow 32 concrete beams from Flushing Creek to the foot of West 39th Street, North River, the scow to be loaded by Precrete.

Shamrock demised the No. 75 to Hughes under the customary New York Harbor oral charter. It is conceded that she was represented as capable of carrying 400 tons. Hughes made an agreement with Merritt-Chapman to rent the No. 75, from July 13, 1954 in the afternoon through July 15, 1954 in the afternoon, for carriage of 32 concrete beams 21 inches by 32 inches by 64 feet, weighing 12 tons each; to tow the scow light to the Tully & Di Napoli dock in Flushing Creek; to tow her loaded to the foot of West 39th Street, North River, on the afternoon of July 14 and to tow her light to her owner on the afternoon of July 15. Demurrage was to accrue at $30 a day after a five day period.

The No. 75 was towed on orders by Hughes from Weehawken to the Tully & Di Napoli dock on July 13. On the morning of July 14 a representative of Concrete Conduit looked over the No. 75. He testified that he saw broken deck planks, signs of hard usage and dryness and that these led him to doubt the fitness of the scow. The scow captain had discovered that one or more seams needed caulking and telephoned to Shamrock to send a caulker. The caulker arrived and went to work but a controversy continued as to whether the No. 75 would carry the approximately 400 tons that the 32 girders weighed. There was much telephoning to the offices of all parties concerned while loading was held up. Final-

ly, at some time past mid morning, Concrete Conduit's crew began loading the No. 75. They laid two pieces of dunnage athwartship. These were 33 feet long and were of thickness and breadth variously described all the way from 3 x 8 to 4 x 14. The barge captain and a runner for Shamrock protested that the dunnage would go through the deck planking with such a load as was planned but the loading continued.

About 2:30 p. m. Shamrock's president arrived because of the continued claims that the No. 75 could not carry all the girders. At that time a bottom tier of about 13 girders was in place and a second tier was either being or was about to be loaded. Some time during the afternoon the president told Concrete Conduit's foreman that it was all right to put 400 tons on the scow. The president says that it was not until later, some time after four o'clock, that he learned from Shamrock's runner that all the load was being put on two pieces of dunnage. The runner went below deck to inspect and while he was there a cracking noise was heard. He testifies that he saw the stringers break and retreated to the deck. The president testifies that, when the runner came up and told him that all the load was resting on two pieces of dunnage, he then told Concrete Conduit's foreman that he had better hold up and said "Let's start taking them off." He says that he told the foreman that the damage had been done so that there was no reason to take all of the girders off.

The Shamrock president's visit to the place where the scow was being loaded was with the intention of making sure that the controversy over the fitness of the scow had been taken care of. The president admits that his runner told him that the whole load was being put on two pieces of dunnage. The runner says that he told the president this as soon as he got to the scow about half past two. If so the president had knowledge of what was going on and made no protest until an hour and a half later. The president, however, says that he was not told that the girders were being loaded on dunnage until just before his protest. It is incredible that in this atmosphere of doubt as to the scow's capacity the runner withheld this information from his boss while the danger of damage was increasing with the addition of each girder. I find that Shamrock's president knew of the manner of loading at half past two and made no protest until four o'clock.

He makes no pretense that he thought the dunnage was being so placed that the concentrated load would not injure the scow.

■ We have then the case of the president of a corporation who made no protest although he knew that the scow that it had demised was being abused in a way which would in the natural course result in injury to the scow. Nevertheless his knowledge and inaction did not affect his corporation's right to damages. It is not enough that one who has demised a vessel knows that the stevedore employed by the charterer is treating his ship in a way likely to injure it and yet fails to protest. The stevedore assumes the responsibility for proper loading of the vessel. The owner who has demised the vessel has no control over the stevedore's actions. Doubtless the stevedore could obtain absolution by disclosing the fact that there was a substantial risk of damage and by getting an advance release from the owner. Mere silence of the owner when he happens to see the improper loading in progress does not, however, absolve the stevedore from liability. See United States v. The Bull Steamship Line, 2 Cir., 274 F.2d 877; McGeeney v. Moran Towing Corp., 2 Cir., 149 F.2d 791.

After the damage had been done, three of the top tier of six girders were removed and the No. 75 was towed to the North River destination without further incident.

Since there was no effective consent by Shamrock to the loading method adopted, there is no substance to the position taken by one or more of respondents that, though there was no way of loading the

girders on the scow without injuring the scow, Shamrock consented to the method adopted.

This position is also defective in that there were at least two ways in which the girders could have been loaded on the No. 75 without injury to the scow or the girders.

First, the girders could have been loaded on the No. 75 so that their permissible bearing points were supported by two of the transverse trusses in the scow's frame. There was testimony, unexplained but uncontradicted, that the pre-stressed concrete girders could not withstand contact with support except within one foot of each of two bearing points 43 feet apart, one 7½ feet from one and the other 11½ feet from the other end. This was the ostensible reason for raising the girders on dunnage at these two points. The No. 75, however, had a series of transverse trusses of longleaf pine as part of her frame separated on 8-foot, 4-inch, centers.

Each of these trusses was amply strong to support one half of the load of approximately 264 tons made up of the 22 girders that were loaded.[1] Two of these trusses, five spaces apart, could be selected, giving a span of 41 feet 8 inches between centers. The trusses were 10 inches wide, however, so that the outside edges of the bearing surfaces were apart by 42 feet 6 inches while the inside edges of the bearing surfaces of the girders could be as close together as 41 feet, giving a lap of a total of 1 foot 6 inches or 8 inches at each end. This would have permitted the use of 8 x 8 dunnage which would be much stronger than the 3 x 8 which was the minimum estimate of the size of the dunnage actually used and even stronger than the maximum 4 x 14.

Another method of loading the girders without injury to themselves or to the scow would be to use heavy pieces of timber, say 12 x 12, as bridges between a pair of transverse trusses near one end of the scow and a pair of transverse trusses at the other end of the scow selected so that when transverse dunnage was placed across them it would support girders by contact at the permissible points of support 43 feet apart on each.

In opposition to Shamrock's suit the claim of unseaworthiness of the No. 75 is made, based upon the fact that she needed caulking, upon the above summarized testimony as to the condition of her deck and upon expert testimony as to the inferences to be drawn from the appearance of the damaged timbers in photographs in evidence. I find that the No. 75 was seaworthy. I accept the testimony of libelant's expert that the girders, loaded as they were in this case, would have caused the damage to a seaworthy scow.

■ Concrete Conduit is thus liable to the owner, Shamrock, for the damage to the scow on general principles of negligence.

Neither Hughes nor Merritt-Chapman were in any degree negligent. No employee of either directed the loading. Were either or both liable for the damage by virtue of their relationship to the scow?

■ Hughes is clearly liable. Even though the damage is not the result of its negligence, a charterer is liable for damage to a vessel caused by the negligence of a third party during the charter period. Roah Hook Brick Co. v. Erie Railroad Co., 2 Cir., 179 F.2d 601; O'Donnell Transp. Co., Inc. v. M. & J. Tracy, Inc., 2 Cir., 150 F.2d 735.

■■ The question is more difficult in the case of Merritt-Chapman. I find that Merritt-Chapman's relation to the scow was that of a sub-charterer. Hughes agreed to supply the scow and to furnish the necessary towing. Merritt-Chapman argues that such an ar-

---

1. Shamrock made no representation that the No. 75 would carry 32 girders with critical bearing points. The reason that the number 22 is important is that it was when 22 were improperly loaded that the damage occurred. It would not have occurred if the 22 had been properly loaded.

rangement is a mere contract for transportation like a railroad's agreement to carry a carload of steel. The cases are different however. Here Hughes did more than agree to obtain transportation. It made an agreement to turn over a specific scow to Merritt-Chapman. A sub-charterer assumes a non delegable duty to the owner to care for the vessel. Seaboard Sand & Gravel Corp. v. Moran Towing Corp., 2 Cir., 154 F.2d 399, 402.

I now pass to the question of liability for damage to the Gantley. The day after the damage to the No. 75 a representative of Hughes telephoned Shamrock's president and said that the No. 75 had not taken the full load and asked that Shamrock have another boat at the Tully & Di Napoli dock in the morning. Shamrock accordingly sent the Gantley. She differed from the No. 75 in that she had three interior bulkheads instead of the transverse trusses. Again the boat was loaded with the girders resting on athwartship dunnage. This time the improper method resulted in cracking one of the athwartship beams in the second bay from the port side, a 12 x 12. The crack was a fresh break and went about half through and was about half an inch wide at the largest end.

I find that the damage resulted from an improper method of loading.

Again the claim is made that the method of loading was acquiesced in by Shamrock since Shamrock's president knew of Concrete Conduit's way of loading the girders before the loading of the Gantley was started. Shamrock's president testified, however, that, after the injury to the No. 75 which resulted from the placing of the girders on dunnage, he made suggestions to representatives of Concrete Conduit with respect to other methods of loading and that he thought some heed would be taken of those suggestions.

I find that there was no acquiescence.

So far as the liability of the various respondents is concerned, the problem of damage to the Gantley does not differ from the problem of damage to the No. 75. The evidence is almost entirely circumstantial but it is sufficient, in the absence of any indication to the contrary, to establish the finding that Hughes was charterer and Merritt-Chapman sub-charterer of the Gantley under the same terms as they had been charterer and sub-charterer of the No. 75. Their liability follows from the same reasoning as was applied in the case of the No. 75.

Concrete Conduit, Hughes and Merritt-Chapman are liable to Shamrock for the damage to the No. 75 and the Gantley described in this opinion. The suit will be referred to a commissioner to fix the amounts of the damages.

This opinion is intended to embody findings of fact and conclusions of law. If additional ones are required requests may be submitted.

Settle order on notice.

**UNITED STATES of America**

v.

**Frank KOWAL.**

**Crim. No. 6696.**

United States District Court
D. Rhode Island.

July 12, 1961.

**402**

Raymond J. Pettine, U. S. Atty., Providence, R. I., Moses Kando, Asst. U. S. Atty., Pawtucket, R. I., for plaintiff.

Charles A. Curran, Providence, R. I., for defendant.

DAY, District Judge.

This is a criminal information wherein the defendant is charged with having engaged in the business of accepting wagers as defined in 26 U.S.C.A. § 4421 without having paid the special occupational tax in violation of 26 U.S.C.A. §§ 7203, 7262 and failing to register with the District Director of Internal Revenue, in violation of 26 U.S.C.A. § 7272. The violations charged are alleged to have occurred on or about November 18, 1960.

The matter is now before me upon the defendant's motion that all personal property seized by police officers during a search by them of the defendant's watch repairing shop at 225 Washington Street, West Warwick, Rhode Island, on November 18, 1960, be suppressed and declared by me to be inadmissible in evidence in any trial of the instant criminal information.

In support of his motion, the defendant contends that the search warrant, issued by the clerk of the District Court for the Fourth Judicial District of the State of Rhode Island on November 18, 1960, pursuant to which, he says, said search and seizure was made was clearly invalid and hence said search and seizure was unreasonable and in violation of the Fourth Amendment to the Constitution of the United States.

At the conclusion of the hearing on the instant motion the Government conceded that said search warrant was invalid. In so doing, the Government is on sound ground. It was clearly invalid, and I would so rule if called upon to do so. The Government's concession removes this issue from the case.

But the Government contends vigorously that said personal property ought not to be suppressed as evidence or declared inadmissible in evidence because (1) said personal property was seized as an incident to a valid arrest of the defendant, and (2) the defendant consented to the search of said premises which re-

sulted in the discovery and seizure of said personal property.

The evidence adduced at the hearing on the instant motion may be briefly summarized as follows: during the afternoon of November 18, 1960, Captain Arthur J. Newton, of the Rhode Island State Police, received information from a special agent of the Intelligence Division of the Internal Revenue Service that the defendant was selling lottery tickets; that upon receipt of this information, he, the special agent, and other members of his department went to the defendant's watch repair shop at 225 Washington Street, West Warwick, Rhode Island, arriving at said shop between 3:30 o'clock p. m. and 4:00 o'clock p. m.; that the shop was closed; that later in the afternoon he talked with an individual who admitted he had been selling "football parlays" tickets for the defendant who would supply him with the money to "pay off" the holder of any winning ticket.

Later in the afternoon, at about 5:40 o'clock p. m., Captain Newton instructed his subordinate, Corporal Robert X. Matthews, to apply to the District Court of the Fourth Judicial District of the State of Rhode Island for the issuance of a search warrant to search the defendant's place of business at said 225 Washington Street "for gambling implements known as 'Lucky Football Parlays'" and to notify him as soon as the warrant was issued. It appears that the warrant was issued shortly thereafter and that Corporal Matthews reached Captain Newton at a restaurant where he was having his dinner and advised him of its issuance, and of his intention to bring the warrant to the premises at 225 Washington Street. Upon completing his meal, Captain Newton, together with two other police officers and a representative of the Internal Revenue Service, proceeded to the defendant's shop, arriving there about 7:00 o'clock p. m.

On this occasion the shop was lighted and the door thereto was unlocked. The evidence established that the shop is a one room affair with show cases for the display of watches and a partition extending the width of the shop, creating a "back room" therein, to which there was an open door-way. Captain Newton testified that upon his party entering the shop there was no one in the front portion thereof which was open to the public, that there was no one in sight, that he proceeded to said open door-way leading to the rear portion of the shop, that he stood in said door-way, looked to his right, and observed the defendant, who was seated at a bench adjoining said partition wall, throw a slip of paper on the floor. According to his testimony he then entered said rear portion of the shop, behind said partition, disclosed his identity to the defendant, picked up said slip of paper, examined it and discovered it to be a football parlay ticket, and then advised the defendant that he was under arrest for having had it in his possession. He further testified that he then said to the defendant, "We are going to look around and search the place. Do you mind?" and that the defendant replied, "No, go right ahead."

Under cross-examination Captain Newton admitted that before entering said premises he knew said search warrant had been issued and that he went into the premises only after he learned that Corporal Matthews had the warrant in his possession, and was en route to said premises, and he also admitted that he told the defendant, after his arrest, that he had a warrant to search the premises.

The evidence further discloses that Corporal Matthews arrived at the premises after Captain Newton and his companions had entered; that he participated in the search of the premises, and that he signed and made a legal return of said warrant, as required, which recited that "pursuant to within warrant" he had made search of the premises described therein and had seized and taken possession of the personal property described in the list attached thereto. Under cross-examination he testified that every article taken by the police officers from said premises was set forth in the list attached to said return.

At the time Captain Newton and his companions entered said premises none of them had a warrant for the arrest of the defendant. In fact, no such warrant had been issued. It is manifestly clear that they entered said premises to search for evidence to connect the defendant with the commission of a crime, and not to arrest him. Assuming, without deciding that defendant's arrest upon the charge stated by Captain Newton was valid, it cannot sustain the search and seizure made in this case. It is generally held that where, as here, the search and not the arrest was the real object of officers entering upon one's premises and that the arrest was a pretext for or at most an incident to the search, the search is not reasonable within the meaning of the Fourth Amendment to the Constitution. Jones v. United States, 1958, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed. 2d 1514; Lee v. United States, 1956, 98 U.S.App.D.C. 97, 232 F.2d 354; Drayton v. United States, 5 Cir., 1953, 205 F.2d 35; McKnight v. United States, 1950, 87 U.S.App.D.C. 151, 183 F.2d 977; Worthington v. United States, 6 Cir., 1948, 166 F.2d 557; Henderson v. United States, 4 Cir., 1926, 12 F.2d 528, 51 A.L.R. 420; United States v. Lassoff, D.C.Ky.1957, 147 F.Supp. 944; United States v. Pollack, D.C.N.J.1946, 64 F.Supp. 554; United States v. Sully, D.C.N.Y.1944, 56 F.Supp. 942.

In Jones v. United States, supra, the Supreme Court said at page 499 of 357 U.S., at page 1257 of 78 S.Ct.:

"These contentions, if open to the Government here, would confront us with a grave constitutional question, namely, whether the forceful nighttime entry into a dwelling to arrest a person reasonably believed within, upon probable cause that he had committed a felony, under circumstances where no reason appears why an arrest warrant could not have been sought, is consistent with the Fourth Amendment. But we do not consider this issue fairly presented by this case, for the record fails to support the theory now advanced by the Government. The testimony of the federal officers makes clear beyond dispute that their purpose in entering was to search for distilling equipment, and not to arrest petitioner. * * * "

In Lee v. United States, supra, where the Government undertook to justify the seizure as an incident to an arrest, the Court held at page 355 of 232 F.2d:

" * * * The police had gone to appellant's apartment with the purpose of checking on the tip from the 'reliable source' that the guns were there, and upon verifying that tip they arrested appellant. A number of courts have held in similar circumstances that such a search is not incident to the arrest, but rather the arrest is in truth incident to the search. United States v. Pollack, D.C.D.N.J., 64 F.Supp. 554, 558; United States v. Sully, D.C.S.D.N.Y., 56 F.Supp. 942; Henderson v. United States, 4 Cir., 12 F.2d 528, 51 A.L.R. 420; Cf. McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977; United States v. McCunn, D.C.S.D.N.Y., 40 F.2d 295; United States v. Setaro, D.C.D. Conn., 37 F.2d 134. And of course the search cannot be justified by what it turned up. United States v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Byars v. United States, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520."

In McKnight v. United States, supra, in holding the search and seizure invalid, the Court said at page 979 of 183 F.2d:

" * * * Even if McKnight's arrest were legal, it would not legalize the seizure of evidence found in the house, since the arrest was incident to the seizure and not the seizure to the arrest. To call this seizure incident to the arrest is like saying that cashing a check is incident to writing it. Means are incident to ends, not ends to means."

And in Henderson v. United States, supra, the Court in holding the search to be illegal, said at page 531 of 12 F.2d:

" * * * And when it appears, as it does here, that the search and not the arrest was the real object of the officers in entering upon the premises, and that the arrest was a pretext for or at the most an incident of the search, ought such search be upheld as a reasonable one within the meaning of the Constitution? Manifestly not."

█ Finding as I do that the object of the police officers in entering said premises was to search for evidence connecting the defendant with the commission of crime and that his arrest was merely incidental to their search, I hold that said search was unreasonable and violated the Fourth Amendment unless it can be fairly said that the defendant consented to the search, as contended by the Government.

█ On this issue the burden of proof rests upon the Government. And where the defendant is under arrest, as here, that burden is particularly heavy. Rigby v. United States, 1957, 101 U.S.App.D.C. 178, 247 F.2d 584; Judd v. United States, 1951, 89 U.S.App.D.C. 64, 190 F.2d 649; United States v. Wallace, 1958, D.C.D.C., 160 F.Supp. 859; United States v. Kidd, 1958, D.C.La., 153 F. Supp. 605; United States v. Gross, 1956, D.C.N.Y., 137 F.Supp. 244.

In Rigby v. United States, supra, the rule is stated at page 585 of 247 F.2d as follows:

"Quite apart from the burden normally devolving upon the accused to demonstrate alleged illegality in the procurement of evidence, we have pointed out that if the Government relies upon consent and alleges the absence of intimidation and duress 'it has the burden of convincing the court that they are in fact absent.' * * * "

In Judd v. United States, supra, the Court states the rule at page 650 of 190 F.2d:

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654; United States v. Kelih, D.C.S.D.Ill.1921, 272 F. 484. The Government must show a consent that is 'unequivocal and specific' (Karwicki v. United States, 4 Cir., 55 F.2d 225, 226), 'freely and intelligently given.' Kovach v. United States, 6 Cir., 54 F.2d 639 * * *

"This burden on the Government is particularly heavy in cases where the individual is under arrest. Nonresistance to the orders or suggestions of the police is not infrequent in such a situation; true consent, free of fear or pressure, is not so readily to be found. United States v. Novero, D.C., 58 F.Supp. 275; United States v. McCunn, D.C.S.D. N.Y.1930, 40 F.2d 295. * * * "

█ The only testimony bearing upon the defendant's consent to said search and seizure was extremely brief. According to Captain Newton, he said to the defendant, "We are going to look around and search the place. Do you mind?" and the defendant is claimed to have replied, "No, go right ahead." Advised as he was while under arrest that the police officers intended to make the search, it would logically appear to him that his objection would avail him nothing and that it would be futile for him to object. In addition, if the defendant had consented unequivocally and freely to said search, I am unable to understand why Captain Newton deemed it necessary, almost immediately after his arrest, to advise him that he had a search

warrant and intended to search said premises. Moreover, if such an unequivocal consent had been given by the defendant, there was no occasion to sign and file the legal return to said District Court stating therein that the search had been made pursuant to said warrant. Considering all of the evidence on the issue of consent and the logical and reasonable inferences to be drawn therefrom, I conclude that the Government has failed to establish by the required degree of proof that the defendant consented to said search. I also conclude that said search and seizure was made pursuant to said search warrant which the Government now concedes was invalid.

A search which is illegal when it starts does not become legal because it is successful. United States v. Di Re, 1948, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520. This rule is clearly stated in United States v. Di Re, supra, at page 595 of 332 U.S., at page 228 of 68 S.Ct. where the Court said:

> "The Government's last resort in support of the arrest is to reason from the fruits of the search to the conclusion that the officer's knowledge at the time gave them grounds for it. We have had frequent occasion to point out that a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success."

It is now the well settled rule that articles obtained as the result of an unreasonable search and seizure are inadmissible in evidence against a defendant over his timely objection in a federal criminal trial. Elkins v. United States, 1960, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed. 2d 1669; Byars v. United States, supra; McGinnis v. United States, 1955, 1 Cir., 227 F.2d 598.

Since said search and seizure was made pursuant to an invalid search warrant and was illegal, I conclude that the articles seized during said search, and described in the list attached to the return made on said search warrant, are inadmissible in evidence in the trial of this case. The defendant's motion is granted. An appropriate order will be entered.

Benjamin J. MOON, Libelant,

v.

UNITED STATES of America, Respondent.

UNITED STATES of America, Petitioner-Respondent,

v.

IRA S. BUSHEY & SONS, INC., Respondent-Impleaded.

IRA S. BUSHEY & SONS, INC., Petitioner-Respondent-Impleaded,

v.

TOLLEFSEN BROS., INC. and George Tollefsen and Margaret A. Tollefsen, co-partners, doing business under the name and style of Tollefsen Bros., Respondent-Impleaded.

No. 20418.

United States District Court
E. D. New York.
July 20, 1960.

Aaron J. Broder, New York City, for libelant, Leonard L. Steinman, New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., Brooklyn, N. Y., for U. S., Benjamin H. Berman and Walter L. Hopkins, Admiralty & Shipping Section, Dept. of Justice, New York City, of counsel.

Charles G. Tierney, New York City, Raymond C. Green, New York City, of counsel, and Lawless & Lynch, New York City, for respondent-impleaded, Ira S. Bushey & Sons, Inc., Howard Davis, of counsel.

Victor J. Herwitz, New York City, for respondent-impleaded, Tollefsen Brothers, Benjamin R. Kaplan, New York City, of counsel.

ABRUZZO, District Judge.

Libelant instituted this suit against the respondent, United States of America, as owner of the Floating Drydock ARD-7 to recover damages for personal injuries sustained on January 15, 1954, while employed as a welder aboard the vessel by respondent-impleaded Ira S. Bushey & Sons, Inc., hereinafter referred to as Bushey, due to the unseaworthiness of the vessel and failure of respondent to provide him with a safe place within which to work.

Respondent United States of America impleaded Bushey claiming indemnity over in the event of a recovery by libelant based upon both an express indemnity agreement and an implied obligation of indemnity. Bushey in turn impleaded Tollefsen Bros., Inc., and George Tollefsen and Margaret A. Tollefsen, doing business as Tollefsen Bros., hereinafter referred to as Tollefsen, to whom Bushey had subcontracted blasting and painting operations on the vessel. Bushey claimed that, if there was any negligence which caused the libelant's accident and for which negligence the libelant is entitled to recovery, it was the sole negligence of Tollefsen.

The ARD-7 was a floating drydock in service with the United States Navy which had been at Bushey's repair yard from early November, 1953, until the date of the accident, undergoing extensive modifications, alterations and repairs under contract between the Government and Bushey (Lib. Ex. 1). The total cost of the job was over $300,000, and entailed, among other things, the modification and alteration of the tail-gate (Gov. Ex. G). The vessel remained at the repair yard of Bushey until January 29, 1954 (Gov. Ex. F) and, at the time of the accident, due to the fact that the tail-gate was still under repair, could not carry out her functions as a floating drydock.

Libelant testified that he started work aboard the ARD-7 about a week prior to the accident, working on the nightshift from 5 p. m. to 1:30 p. m. The vessel was moored to a pier at Bushey's drydock and on the pier was a sandblast hopper which is a funnel-shaped contraption into which sandblast material is put in it and then shot from a hose. Libelant was assigned to weld a ½ inch or ⅝ inch steel insert plate measuring 4 feet by 4 feet to the bulkhead on the port side of the vessel just beyond midship toward the stern at the very bottom of the drydock. On the night before the accident he finished welding the plate on the dock side. Just prior to the accident he stood between the catwalk and the wing wall

and had welded one inch of the left side of the plate to the bulkhead on an upbeat from the bottom of the plate. He disposed of the stub of the welding wire, turned to his right to reach for a new welding wire in back of him and his foot slipped on some damp sandblast shot or grit, and he fell into an open hole about 5 feet by 5 feet and more than 10 feet deep against a beam straddling the hole.

Libelant testified there was a single light on a pole behind him aft on the other side of the catwalk which illuminated the panel or insert on which he was working and, although there was sufficient light to illuminate the insert, it failed to illuminate the beam or hole into which he fell. He did not see the sandblast, hole, beam or grit before the accident. He later pulled or "wormed" himself onto the deck and there was sandblast grit on his face, welding gloves and clothing.

Libelant never told anyone connected with his employer Bushey about the sandblast material. He did not recall telling his "snapper" whom he identified as "Hawkins" about the sandblast material and did not tell the physician to whom he was taken after the accident about the sandblast material. Furthermore, the first notice given to Tollefsen about his accident was when an action was commenced in the New York State Supreme Court about 3 years after the accident occurred. The summons and complaint in said action are dated December 21, 1956.

Haaken Englesen, Bushey's assistant foreman on the nightshift, testified that he is known as "Hawkins." He stated that there were 2 drop lights illuminating the area in which libelant was working, one of which had a 300-watt bulb and was wire-enclosed; the other a 500-watt solidly enclosed by metal. Both lights were lit when he made his inspection. He also testified that the area in which libelant was working was clean and he saw no sandblast grit on Moon's clothing or body.

George Tollefsen testified that no sandblasting work had been performed aboard the ARD-7 after January 2, 1954, and that the deck had been painted promptly after sandblasting in conformity with Navy requirements that bare metal be painted within one week after sandblasting.

The Court places no credence in the testimony of the libelant and finds that there was light in the area in which the libelant was working, sufficient to enable him to see the hole in which he claims he fell. The Court also finds that there was no sandblasting material aboard the vessel at the time of the accident.

Based upon this testimony the Court cannot find that the libelant has sustained the burden of proof cast upon him of proving by a fair preponderance of the evidence that there was not sufficient light in the area in which he was working, nor that there was any sandblast material at the place where the libelant was working, upon which a finding of negligence could be predicated.

Besides the question of credibility, this suit presents another aspect which defeats libelant's claim. The witness Burns, a warrant officer in the United States Navy and a ship's repair technician, testified that he had been assigned to the ARD-7 in August, 1953. In the first week of November, 1953, the vessel went into Bushey's yard and he was stationed aboard the vessel during all the time the vessel was undergoing repairs. There were crew quarters aboard the vessel which had a complement of three officers and 31 men but after 4 p.m. only a skeleton crew of 6 men of various rates had to remain aboard. The only duties of the officers and crew during the time that the ship was at Bushey's was that of housecleaning. They did no work aboard her, nor did they supervise the work. They were merely responsible for the safety and cleanliness of the vessel. Rounds were made by the crew at night but not during the day. This crew remained on board the ship for security reasons. It was the crew's duty to see that fires did not break out on board the vessel and that no material was stolen. Burns testified unequivocally that the

crew had no control over the work and did not have any authority over Bushey's men. Bushey was working on this drydock pursuant to a contract (Lib. Ex. 1) and specifications attached thereto.

The witness Ziegler testified that he was a civilian Navy inspector, one of the three assigned to the ARD–7 while she was at Bushey's undergoing repairs. The job of the inspectors was merely to inspect the details of each job upon completion and see that they conformed with specifications. No inspector had the duty or authority to supervise the manner in which a particular job was being done except where the safety of the vessel was concerned, or the job was being done in such fashion that it could not be completed properly or on time. He had no duty with respect to the safety of Bushey's repair workers. He also testified that a grating which normally covered the hole had been removed during the work but not by any Government employee. He testified that all light and power aboard the vessel came from outside the vessel and were supplied by Bushey.

The doctrine of liability of a shipowner who has turned his vessel over to a contractor for overhaul or repairs has been determined by the Supreme Court in the recent case of West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L. Ed.2d 161. The Court of Appeals for the Second Circuit in the case of Lawlor v. Socony-Vacuum Oil Co., 275 F.2d 599, briefly summarized some of the facts and the law of the West case. It said (275 F. 2d at page 603):

> "The most recent decision by the Supreme Court on this subject is West v. United States, 1959, 361 U.S. 118, 80 S.Ct. 189, 192, 4 L.Ed.2d 161. There the Mary Austin was removed from the 'moth ball fleet' at Norfolk, Virginia, and turned over to a contractor for 'a complete overhaul,' so that she could be reactivated and put in condition for sea duty. It was held that an employee of the contractor could not recover for unseaworthiness as there was no duty

on the part of the shipowner to maintain the vessel in a seaworthy condition. Six of the shipowner's men, a captain, chief mate, second mate, chief engineer, assistant engineer and steward were on board, but solely for the purpose of inspecting the progress of the work. The control of the entire vessel was at all times relevant to the issues in the case in the contractor. [sic] She was about as unseaworthy as a vessel can be and still remain afloat and she was turned over to the contractor 'for the sole purpose of making her seaworthy.'

> "As said by Mr. Justice Clark:

> " 'It would appear that the focus should be upon the status of the ship, the pattern of the repairs, and the extensive nature of the work contracted to be done, rather than the specific type of work that each of the numerous shore-based workmen are doing on shipboard at the moment of injury.' "

and (at page 604):

> "West, however, makes it clear that, at least in some cases, control of the vessel is a decisive factor, for there it was said:

> " 'Petitioner overlooks that here the respondent had no control over the vessel or power either to supervise or to control the repair work on which petitioner was engaged. We believe this decisive against both aspects of plaintiff's dual theory' (negligence and unseaworthiness)."

The facts in the West case are to a very large extent similar to the instant suit. The opinion in West sets forth other facts as follows (361 U.S. at pages 121, 122, 123, 80 S.Ct. at pages 192):

> "It is evident that the sole purpose of the ship's being at Atlantic's repair dock at Philadelphia was to make her seaworthy.

> \* \* \* \* \* \*

> "The Mary Austin, as anyone could see, was not in maritime service. She was undergoing major re-

pairs and complete renovation, as the petitioner knew. Furthermore, he took his orders from the contractor, not the shipowner. He knew who was in control. This undertaking was not "ship's work" but a complete overhaul of such nature, magnitude, and importance as to require the vessel to be turned over to a ship repair contractor and docked at its pier for the sole purpose of making her seaworthy. It would be an unfair contradiction to say that the owner held the vessel out as seaworthy in such a case.

\* \* \* \* \* \*

"Other than the doctrine of seaworthiness, whose nonrelevancy to this case we have set forth, our decisions establish no basis of liability apart from fault. Of course, one aspect of the shipowner's duty to refrain from negligent conduct is embodied in his duty to exercise reasonable care to furnish a safe place to work. \* \* \* Petitioner overlooks that here the respondent had no control over the vessels, or power either to supervise or to control the repair work in which petitioner was engaged.

\* \* \* \* \* \*

"Although some of respondent's employees were on board the ship here, this would not attach liability since they gave no orders, and did not participate in the work or supervise its progress, but were simply inspectors or observers."

The only difference between West and the instant suit is that in West the ship had been in the "Moth Ball Fleet" completely deactivated for several years. In the instant case the ARD–7 had not been in a "Moth Ball Fleet" but had been in drydock for several months and as in West was totally deactivated.

In the suit at bar the respondent had completely turned over the vessel to Bushey. The control of the vessel lay entirely with Bushey. Applying the principles laid down in the West and Lawlor cases, supra, the United States of America is entitled to a decree on the theory that having parted with complete control of the vessel it is not responsible for any injuries sustained by the libelant.

The libel against the United States of America therefore must be dismissed. In view of the dismissal of the libel, the questions of respondent's liability over as against Bushey and Bushey's liability over as against Tollefsen has become moot and the respective petitions to implead must also be dismissed.

Submit findings of fact and conclusions of law together with a decree not later than July 27, 1960.

**UNITED STATES of America,**
**Plaintiff**

**v.**

**UNITED WRECKING CORPORATION**
**and**
**Edward A. Skyanier, Defendants.**

**Cr. No. 20441.**

United States District Court
E. D. Pennsylvania.
Aug. 16, 1961.

⊙―1104

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Graeme Murdoch, Asst. U. S. Atty., Philadelphia, Pa., Ernest N. Votaw, Regional Atty., Leo L. Holstein, Deputy Regional Atty., U. S. Dept. of Labor, Chambersburg, Pa., for plaintiff.

Martin Heller and Marvin J. Levin, of Freedman, Landy & Lorry, Philadelphia, Pa., for defendants.

LAYTON, District Judge.

This is a criminal action brought under Section 215 of the Fair Labor Standards Act of 1938, as amended. 29 U.S. C.A. §§ 201–219. The evidence presents questions concerning coverage of the Act and the burden of proof to be borne by the government in a criminal proceeding such as this. Plaintiff has charged defendants with violations of the Act in four counts:

Count I—that defendants wilfully and unlawfully paid a night watchman named Samuel Wright less than the minimum wage of one dollar an hour during the period beginning January 8, 1958, and ending December 27, 1958.

Count II—that defendants wilfully and unlawfully failed to pay time and a half

overtime wages to eight named employees during the period January 1, 1958, and February 25, 1959.

Count III—that defendants wilfully and unlawfully made false records of the hours worked by seven named employees during the period January 1, 1958, and February 25, 1959.

Count IV—that defendants wilfully and unlawfully failed to keep and preserve any record showing the hours worked by Samuel Wright, the night watchman, during the period beginning January 8, 1958, and ending December 27, 1958.

Defendants plead not guilty to all parts of the information which pertain to Samuel Wright, the night watchman. (Counts I, II & IV). Defendants also plead not guilty to parts of Count II pertaining to another employee named Horace Spikes. As to all other employees named in Counts II and III, defendants plead nolo contendere, thus admitting the allegations. Therefore, only Spikes and Wright need be considered here. Defendants concede that there was wilful failure to keep records of hours worked by Wright as alleged in Count IV. Defendants' sole contention with respect to Count IV is that Wright does not fall within the scope of the Fair Labor Standards Act. Defendants deny failure to pay a minimum wage or overtime to Wright as alleged in Counts I and II. It was stipulated that the other employee, Spikes, is covered by the Act. But defendants say the government has failed to prove the violations alleged, thus raising only issues of fact, which must now be determined by the court, since defendants waived a jury.

The facts are as follows. United Wrecking Corporation is a Pennsylvania corporation whose business is demolishing buildings and selling the scrap. In December of 1957, defendant, Edward A. Skyanier, president of United, entered into a contract with another Pennsylvania corporation to demolish buildings on a large area near Philadelphia known as the "Brill Site." Under the contract, United purchased certain buildings on the site and agreed to demolish and remove all the materials comprising the buildings, leaving the site clean of debris. Paragraph 5 of this contract provided that United "shall * * * maintain security for the protection of the aforesaid buildings and property upon the site and shall engage night watchmen for such purpose and purposes." Partly pursuant to this contract provision and partly to retain favorable public liability insurance rates, defendants employed Wright as night watchman in the winter of 1958. He worked continuously from January 1, 1958, to December 27, 1958. Spikes was employed by United at the Brill Site as a burner and as a truck driver during the period January 1, 1958, and February 25, 1959.

I.

In the words of Maurice Skyanier, defendant's son, Wright's duties were to "protect anyone or anything that would have to be protected" on the Brill Site. Wright walked around the plant and checked tool boxes and equipment to make certain none were taken. He guarded piles of scrap on the site, which included scrap iron, copper, wires and lumber. There was also a quantity of used brick in the area patrolled by Wright. Occasionally Wright would put out fires and would call the fire department if a blaze got out of control. At all times he was supposed to keep pedestrians and trespassers away from the property, especially school children during the late afternoon and early evening. During weekdays, Wright began work at 4:30 in the afternoon when the wrecking crew left for the day, and watched until 8:00 the following morning, when the workmen returned. Wright also watched on week ends whenever there was a holiday or for some other reason none of the wrecking crew worked. While on duty Wright stayed at a shack located on the site premises where he cooked, took naps, and kept warm during the course of his duty. Wright was paid $30 a week by either defendant, Edward A.

Skyanier, or his son, Maurice Skyanier, although he occasionally received $2 extra for work on Saturdays and $5 extra for work on Sundays. There is evidence from which it might be inferred that the scrap iron, lumber, wire and copper guarded by Wright was eventually sold to various dealers. However, careful search of the record reveals no evidence showing that any such purchasers came from a state other than Pennsylvania or that the scrap metals and lumber guarded by Wright found its way into interstate commerce. On the other hand, used brick in substantial quantities were from time to time purchased by an out-of-state buyer and hauled to a neighboring state.

■■■■ In addition to watching, Wright utilized some of his spare time cleaning used brick that lay about the site. For this activity he was paid $6 per thousand brick cleaned. Over the period January 1958 to December 1958, Wright cleaned approximately 6,000 brick for which he received about $36. The only evidence in the record that used brick on the Brill Site found its way into interstate commerce is the testimony of Charles J. Della Vecchia, President of the Jersey Dunbrik Manufacturing Company, a firm having its principal place of business in Osage, N. J. Della Vecchia bought used brick located on the Brill Site from defendants in periodic transactions from April to November 1958. Analysis of 42 checks drawn by Jersey Dunbrik Manufacturing Co. to the order of United in payment for used brick (Government Exhibit No. 7) shows that 152,600 used brick were purchased by Della Vecchia for a total of $2183.10 over the eight month period. If each check is viewed as a separate transaction, there were 42 trips from New Jersey to the Brill Site in Pennsylvania where Della Vecchia (or his employees) loaded trucks with used brick. For the eight months, there was an average of five trips made, and 19,075 brick worth $272.89 purchased each month. However, Della Vecchia testified that he had never hired a brick cleaner at the Brill Site, and never paid separate amounts to have brick cleaned there. There is no evidence that he knew Wright or purchased brick that had been cleaned by Wright. Wright was not the only brick cleaner. During the course of the year in question there were approximately ten brick cleaners at the Brill Site. There were also approximately four or five other jobbers such as Della Vecchia who bought used brick. It is significant that the record does not show whether these other jobbers were local or from another state. The court recognizes that plaintiff cannot be required to trace each individual brick cleaned by Wright into the hands of an interstate purchaser. Southern Advance Bag & Paper Co. v. United States, 5 Cir., 1943, 133 F.2d 449. But in a criminal proceeding the government must prove its allegations beyond a reasonable doubt. This the government has not done. The 6000 brick cleaned by Wright for an entire year represents only 3.9% of the 152,600 brick purchased by the only interstate purchaser, Della Vecchia, in eight months. There is a reasonable doubt that Della Vecchia purchased any of the brick cleaned by Wright. It is obvious that 96.1% of the brick purchased by Della Vecchia was cleaned by the other ten cleaners. It seems quite possible that all of it was cleaned by them.

■■■ The evidence amply justifies the following findings relating to alleged violations of the Act:

(1) Wright was employed by defendants for more than 40 hours a week and was wilfully paid no overtime wages during the period January 8, 1958, to December 27, 1958.

(2) Wright received only $30 a week wages during this period, which is less than the statutory minimum wage of one dollar an hour. The failure of defendants to pay Wright the minimum wage was wilful.

The evidence also justifies these findings relating to coverage of Wright by the Act:

(1) Wright was employed as a watchman to guard against fire and trespassers, and to prevent damage to or stealing of anything valuable on the site, including tools, machinery, scrap metal, copper, wiring, lumber, brick, etc.

(2) The government failed to prove beyond a reasonable doubt that any of the scrap metal, copper, wiring, or lumber watched by Wright found its way into interstate commerce.

(3) The government failed to prove beyond a reasonable doubt that any of the brick cleaned by Wright for which he was paid were sold into interstate commerce. Moreover, the amount of brick cleaned, 6,000, and the total amount Wright received for labor, $36 for the entire year, was so negligible as to merit little or no consideration.

(4) The government has proved beyond a reasonable doubt that not only was Wright employed, among other things, to watch or guard brick, but that a substantial quantity of brick worth $2,183.10 was sold in interstate commerce.

(5) The contract between defendant corporation and the owner of the Brill Site required a watchman, and the presence of a watchman helped lower defendants' insurance rates.

■ In the light of the foregoing findings of fact, we must now determine whether Wright is covered by the Act. The introductory clause of Section 206 (a) (minimum wage provision) and Section 207(a) (overtime pay) (29 U.S. C.A. §§ 206 and 207) limits coverage to "employees who [are] engaged in commerce or in the production of goods for commerce." Thus, plaintiff must prove four things in order to establish that Wright is subject to the Act: (1) that Wright was an "employee"; (2) that Wright was either engaged *"in"* commerce or in *"production"* of goods for commerce; (3) that there were *"goods"*; and (4) that there was *"commerce"*—all within the meaning of the Act. It was stipulated that Wright was an "employee" of defendants and it is uncontested that the scrap and used brick are "goods" within the meaning of 29 U.S. C.A. § 203(i). See Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883, 886; Sams v. Beckworth, 5 Cir., 1958, 261 F.2d 889, 891. We need not determine whether Wright was engaged "in" commerce or was a "producer of goods for commerce" in his capacity as a brick cleaner because there was insufficient proof that the brick he cleaned entered into "commerce", as defined in 29 U.S.C.A. § 203 (b) ("trade [or] transportation * * * between any state and any place outside thereof").

However, Wright in his capacity as a watchman may have been in "production of goods for commerce." Here it was adequately established that the brick Wright watched did enter "commerce."

■■ In a 1949 amendment to the Act, Congress attempted to make clearer what employees are covered by the phrase "production of goods." 29 U.S. C.A. § 203(j) states:

"* * * an employee shall be deemed to have been engaged in the production of goods if such employee was employed * * * in any *closely related* process or occupation *directly essential* to the production thereof * * *." (Emphasis supplied).

The scope of this definition in Section 203(j) has been a source of much litigation. Congress intended it to mark the outer limit of coverage under the Act. Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 316–317, 80 S.Ct. 739, 4 L.Ed.2d 753. However, it is apparent from legislative history that the scope of the Act is not coextensive with the limits of the constitutional power of Congress to regulate commerce under the commerce clause. See the detailed analysis of legislative history in Kirschbaum v. Walling, 1942, 316 U.S. 517, 522–525, 62 S.Ct. 1116, 86 L.Ed. 1638, Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 316–318, 80 S.Ct. 739, 4 L.Ed.2d 753, Mitchell v. Dooley Bros., Inc., 1 Cir., 1960, 286 F.2d 40, 42–44. Congress has

impliedly left a domain for regulation by the states. "Congress may choose, as it has chosen frequently in the past, to regulate only a part of what it constitutionally can regulate, leaving to the States activities which, if isolated, are only local." Kirschbaum v. Walling, 1942, 316 U.S. 517, 521, 62 S.Ct. 1116, 1119, 86 L.Ed. 1638. The problem, then, is to draw a line between those activities which Congress left to the states and those which were intended to come within the Act.

To satisfy Section 203(j), as amended in 1949, Wright's activities as a watchman must not only be "directly essential" but also "closely related" to the production of used brick (see the italicized portion of Section 203(j) quoted supra). Defendants urge that these standards in the 1949 amendment were intended to restrict the coverage of watchmen under the Act. To support this contention, defendants have quoted extensively in their brief from the recent Supreme Court decision, Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 80 S.Ct. 739, 4 L.Ed.2d 753. This case, however, damages more than it helps defendants. Zachry concerned coverage of construction workers (not watchmen) on a dam that impounded water for a local water distribution system in Texas. Some of the water eventually was utilized by industries producing goods for commerce. The Court held that these construction workers were outside the scope of Section 203(j) because their activities were not "closely related" to the production of goods. But in reaching this result, the Court made a careful distinction between these construction workers, who were not covered, and maintenance workers, such as watchmen, whom it assumed, arguendo, would have been covered. 362 U.S. at pages 319–321, 80 S.Ct. at pages 745–746. It is true that the 1949 amendment to Section 203(j) narrowed coverage of the Act. It is not true, as defendants urge, that coverage of watchmen and other maintenance employees was necessarily affected. The assumption of Zachry is

that maintenance workers such as watchmen would have been subject to the Act under the facts of that case. Defendants' contention is further weakened by the fact that the leading case dealing with coverage of maintenance workers, Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, was expressly approved by Congress in 1949. Report of the Majority of Senate Conferees, 95 Cong.Rec. 14875 (1949); H.R. Rep. No. 1453, 81st Cong. 1st Sess. 14 (1949). See also Mitchell v. Dooley Bros., Inc., 1 Cir., 1960, 286 F.2d 40, 42.

■ The court here finds that Wright's activities were "directly essential" to the production of used brick. His presence on the site was required in the contract between United Wrecking Corp. and the owner of the Brill Site. Wright safeguarded the property from fires which might have interfered with production. In addition, Wright's presence helped reduce defendants' insurance rates. This last fact alone was evidence that his activity was "directly essential" within the meaning of Section 203(j). See Walton v. Southern Package Corp., 1944, 320 U.S. 540, 542, 64 S.Ct. 320, 88 L.Ed. 298; Armour & Co. v. Wantock, 1944, 323 U.S. 126, 131, 65 S.Ct. 165, 89 L.Ed. 118.

The court also finds that Wright's activity as a watchman was "closely related" to the production of used brick and is well within the rule of Kirschbaum v. Walling, 1942, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638 (watchmen in the building where dresses were manufactured for commerce held covered by the Act). See also Borden Co. v. Borella, 1945, 325 U.S. 679, 65 S.Ct. 1223, 89 L. Ed. 1865 (watchmen in central administrative office building of a large corporation held covered even though no goods actually manufactured in the building). Compare 10 East 40th St. Bldg. v. Callus, 1945, 325 U.S. 578, 65 S.Ct. 1227, 89 L. Ed. 1806 (activities of watchmen in a general office building where no actual manufacturing took place, and with numerous and constantly changing tenants, not covered). For a useful analysis of

**416**

the meaning of "closely related", see Mitchell v. H. B. Zachry Co., 1960, 362 U.S. 310, 319–321, 80 S.Ct. 739, 4 L.Ed. 2d 753. Wright's activities as a watchman took place where the used brick were physically produced, as in Kirschbaum. The brick were transported directly from the Brill Site by Della Vecchia's trucks into a neighboring state. There were no intermediate processes or places separating the activity of the watchman and the physical production of the goods which entered commerce. The activities of the watchman, Wright, were thus "closely related" to the production of goods and fall within Section 203(j). From this it follows that Wright is covered by the Act.

This conclusion is entirely consistent with the holding in Sams v. Beckworth, D.C.E.D.Tex., 168 F.Supp. 686, affirmed 5 Cir., 1958, 261 F.2d 889, another case relied on by defendant. There a watchman in a junkyard was held not covered by the Act. But in Sams, the scrap guarded by the watchman was first sold to local junk dealers who in turn sold a substantial amount of scrap to certain steel foundries, also located in the same state. The foundries processed the scrap into steel products and only thereafter did any of the scrap enter into the channels of interstate commerce. 168 F. Supp. at pages 687–688. The court held, and correctly so, that the activities of the watchman were not an occupation "closely related" to the production of goods for commerce. There were too many steps intervening between the watching activity in the junkyard and the production in the foundries of the steel products that entered commerce. Comparable distinguishing features are present in another case relied upon by defendant, Mitchell v. Jaffe, 5 Cir., 1958, 261 F.2d 883.

Since Wright, in his capacity as a watchman, is covered by the Act, and since defendants have wilfully failed to pay him the minimum wage required by Section 206 and overtime required by Section 207, it follows that defendants are guilty under Counts I and II as charged. Defendants have admitted wilful failure to keep any records of employment as required by Section 211(c) of the Act. Thus, they are guilty as charged under Count IV, as well.

## II.

We now return to the other employee at issue: Horace Spikes. Spikes was employed by the United Wrecking Corporation at the Brill Site for 28 to 30 weeks between June and December, 1958. He had first been hired at the site as a "burner." A "burner" uses an acetylene torch to cut scrap steel into pieces so that it can be handled and loaded onto trucks. For this work Spikes was paid $1.50 an hour, but after six weeks he was transferred to work as a truck driver. At the same time, he received a 15-cent raise to $1.65 an hour. Thereafter, he drove a truck whenever he wasn't "burning." Spikes' normal working hours were from 8:00 in the morning until 5:30 or 6:00, sometimes 7:00, in the evening. Spikes also worked on several weeks ends. He worked eight to ten Sundays and an unknown number of Saturdays—but at any rate, more Saturdays than Sundays. When Spikes worked on a Saturday, he received his usual weekly wage of $1.65 an hour. On Sundays, he received $2. He received his pay at all times in an envelope which he picked up at the office of the United Wrecking Corporation.

Since it was stipulated that Spikes is covered by the Act, we need only determine whether the facts, as found above, show defendants are guilty of wilful failure to pay Spikes overtime wages. The court finds defendants guilty under Count II as to Spikes because the facts show he worked more than 40 hours a week and defendants failed to pay him time and a half overtime as required by 29 U.S.C.A. § 207. On review of the entire record, the court concludes that this failure on the part of defendants was deliberate and wilful.

FIRST NATIONAL BANK IN BILLINGS, a National Banking Association, Security Trust & Savings Bank, a corporation, and the Yellowstone Bank, a Corporation, Plaintiffs,

v.

FIRST BANK STOCK CORPORATION, a Corporation, Midland National Bank of Billings, a National Banking Association, and Valley State Bank, an ostensible Corporation, Defendants.

Civ. No. 282.

United States District Court
D. Montana,
Billings Division.

April 6, 1961.

**418**

Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., Luxan & Scribner, Helena, Mont., for plaintiffs.

W. F. Marquart, Curtis L. Roy and Dorsey, Owen, Barber, Marquart & Windhorst, Minneapolis, Minn., Cooke, Moulton, Bellingham & Longo, Billings, Mont., for defendants.

KILKENNY, District Judge.

Action for declaratory judgment and injunctive relief.

Count I charges defendants with the violation of the Bank Holding Company Act of 1956, 12 U.S.C.A. §§ 1841–1848. Count II charges defendants with the violation of the National Banking Act, 12 U.S.C.A. § 36, and Section 5–1028 of the Montana Code. The cause is before the Court for decision on an agreed statement of facts, on defendants' motion to dismiss, plaintiffs' motion for summary judgment on Count I and defendants' motion for summary judgment on Counts I and II.

At the time of filing the complaint four of the banks were located in the City of Billings, Montana, and one bank in Laurel, Montana, a short distance from Billings. About November 1, 1960, a fifth bank, Valley State Bank (herein called Valley) opened temporary quarters in a dwelling house in West Billings, Montana. The legality of the conduct of Valley is challenged in these proceedings. Substantially all of the capital stock of three of said banks located in Billings is owned by bank holding companies having principal offices outside of Montana. Midland National Bank of Billings (herein called Midland) is a national banking association.

First Bank Stock Corporation is a holding company incorporated in Delaware in April, 1929 and has been and now is subject to and registered under the Bank Holding Company Act of 1956. Its corporate purpose is to acquire and retain stock ownership in banks and trust companies. First Bank has its offices in First National Bank Building, Minneapolis, Minnesota. First Bank owns a majority of the stock in 87 banks and trust companies which conduct their banking business out of 94 banking offices in the Ninth Federal Reserve District, to wit: Wisconsin, Minnesota, North Dakota, South Dakota and Montana.

Early in 1955, at a time when the Bank Holding Company Act was under

consideration in the Congress of the United States, First Bank applied to the Comptroller of Currency of the United States for a charter for a new national bank to be located in Billings, Montana. In March of that year the Superintendent of Banks wrote to the Comptroller of Currency indicating that existing banks in Billings were capable and sufficient to serve the needs of the city and the community. In April of that year certain banks wrote the Comptroller of Currency objecting to the application filed by First Bank and late in 1955 the Comptroller rejected said application.

On November 29, 1955, the incorporators of Valley caused an application and articles of agreement to be filed with the Superintendent of Banks of the state of Montana. A certificate of authorization on said application was issued by said Superintendent to Valley on April 30, 1956, and the capital, surplus and undivided profits of Valley in the sum of $300,000 were paid prior to that time. Included in such sum was the purchase price paid by First Bank Stock Corporation (herein called First Bank) for its 1,460 shares of stock in Valley. Valley's bylaws were adopted by its stockholders on April 30, 1956, at which time the articles of agreement were approved and accepted and directors elected. On the same date the first meeting of Valleys' board of directors was held, their oaths being transmitted to the Superintendent of Banks. Thereafter, monthly meetings of such board were held and annual meetings of the stockholders of Valley were held on January 8, 1957, January 14, 1958, January 16, 1959, and January 12, 1960. On November 16, 1960, First Bank owned ninety-nine percent of Midland's shares and ninety-six and two-thirds percent of Valley's shares. Shares of Midland and Valley not owned by First Bank are directors' qualifying shares with respect to which First Bank has option to purchase at book value after a director's term ceases. Midland, Valley and First Bank are defendants.

Substantially all of the stock of Billings State Bank is owned by Northwest Bank Corporation, an out-of-state bank holding company. First National Bank in Billings, one of the plaintiffs (herein called First National), is a national banking association. Security Trust & Savings Bank, one of plaintiffs (herein referred to as Security), is a bank organized under the laws of the state of Montana. The Yellowstone Bank (herein called Yellowstone), is a bank organized under the laws of the state of Montana.

On April 30, 1956, shares of the capital stock of Valley were issued and temporary stock certificates were used, no permanent stock certificates having been printed at that time. The temporary certificate for 1,460 shares was issued on said date to First Bank and such bank was in possession of such certificate long prior to May 9, 1956. All of the temporary certificates were issued and delivered prior to such date. All meetings of the board of directors of Valley prior to the institution of this litigation were held either in Midland's offices or in the offices of one of its attorneys.

During the first few months of Valley's operations a large part of Valley's deposits will be drawn from Midland. Thereafter, Valley's deposits probably will be drawn from the other Billings banks approximately as follows: thirty-nine percent from Security; thirty-three percent from Midland; nineteen percent from First National, and nine percent from Billings State Bank. A small percentage of the above may be diverted from Yellowstone.

Valley's temporary location is approximately two miles from the respective banking houses of Security, Midland, First National and Billings State Bank, and approximately thirteen miles from Yellowstone's banking house. If Valley is permitted to continue its banking operations, loss in deposits to plaintiffs will be substantial. The present value of the right, if any, of Valley to receive the deposits above mentioned, capitalized over a reasonable number of years at a reasonable rate of interest, is far in excess of $10,000, exclusive of interest and costs.

On September 29, 1960, all four of Valley's directors, who were officers or directors of Midland, resigned. One director who was attorney for both Midland and Valley did not resign. The directors elected on that date were an employee of the First National Bank of Minneapolis, a First Bank affiliated bank, and three Billings businessmen. These resignations and elections took place after the commencement of this litigation.

Prior to August 1, 1960, all or substantially all of the correspondence to Valley was addressed to its officers who were likewise officers of Midland at Billings. All or substantially all of the correspondence sent to Billings and related to Valley was typed on Midland's stationery. Valley had no banking house prior to November 1, 1960, and had no stationery of its own prior to October 24, 1960. Valley purchased a lot in Billings in June 1959. A wholly-owned subsidiary of First Bank prepared proposed sketches and plans for Valley's banking house. In August 1960, after defendants had been served, Valley passed a resolution to defend the action and proceeded with its plans for the construction and opening of the bank. Valley had no employees and paid no salaries prior to the institution of the law suit and no compensation was paid to the directors until after the adoption of a resolution on January 13, 1959. Valley was not listed in any telephone directory in the state of Montana or elsewhere. Neither Valley nor its shareholders have paid the Montana state tax on banks located and doing business in the state or on shares of stock in such bank. Income taxes were paid by Valley for the years 1957, 1958 and 1959 and the Montana Corporation License Tax, based on corporate income, was paid by Valley for the same years. Valley from time to time has expressed a desire to operate as an insured bank, but has never been insured. Valley's proposed bank building would cost approximately $211,000. Nothing was done in connection with construction or preparation for construction prior to August 11, 1960. Extensions of time to commence business were granted Valley from time to time by the Montana Superintendent of Banks to January 1, 1961 and the bank commenced business prior to that date. Valley's temporary quarters are located on property which it leased on September 12, 1960.

Prior to September 27, 1960 the certificates representing Valley's directors' qualifying shares were kept for safe keeping at First Bank's offices in Minneapolis. Since that time the certificates are retained in possession of Valley's directors. From the date of incorporation until September 29, 1960, all correspondence relating to Valley was carried on from Midland National Bank. Midland is and will be Valley's chief correspondent bank. Valley has its own capital, surplus and undivided profits, separate from Midland, and maintains its own books of account and has its own stationery, checks and forms, none of which make any reference to Midland.

Other facts, of no particular significance as I view them, appear in the agreed statement. The issues, if any, raised in paragraphs 32, 44, 47, 58, 62, 69, 73, and 75 are not of such importance as to prevent a decision at this time.

After commencement of this litigation First Bank submitted to the Board of Governors of the Federal Reserve System a statement of facts with reference to the controversy and a copy of the complaint and requested an opinion on two points.[1] After consideration the Board

"(2) Whether, under the facts outlined above, the act of Valley State Bank at some time in the near future in beginning the conduct of a public banking business while First Bank Stock Corporation continues to own stock in Valley State Bank will constitute a violation by First Bank Stock Corporation of Section 3 of the Bank Holding Company Act."